Kirby ARBAUGH *v.* AG PROCESSING, INC.,
and Specialty Risk Services

CA 03-1057                                          184 S.W.3d 53

Court of Appeals of Arkansas
Divisions I, II, and III
Opinion delivered June 2, 2004

*Frederick S. "Rick" Spencer*, for appellant.

*Anderson, Murphy & Hopkins, L.L.P.*, by: *Randy P.Murphy* and *Jason J. Campbell*, for appellees.

JOHN F. STROUD, JR., Chief Judge. Appellant, Kirby Arbaugh, sustained a compensable injury on June 2, 2000, when he was shocked with 440 volts of electricity. This injury occurred when one

of Arbaugh's co-workers, John Hicks, was instructed to repair an electrical cord on a feed-bag line although he told his supervisor that he did not know how to do it. Hicks was told to repair the plug on the cord anyway until he got it right. As a result of the improper wiring by Hicks, Arbaugh was shocked when he attempted to turn on the electrical switch to the feed-bag line.

Appellant contended at the hearing held before the ALJ that as a result of the electrical shock, he suffered both a psychological injury and an organic-brain injury. Appellees, AG Processing, Inc., and Specialty Risk Services, claimed that appellant's problems were psychological and that they preexisted the injury. The ALJ found that appellant failed to prove by a preponderance of the evidence that his cognitive dysfunction and psychological problems were causally related to the June 2, 2000 incident; that he failed to prove that his cognitive dysfunction and psychological problems arose out of and in the course of his employment; that he failed to establish by a preponderance of the evidence the elements necessary to prove a compensable organic-brain injury; and that he failed to establish by a preponderance of the evidence the elements necessary to prove a compensable psychological injury. The Commission affirmed and adopted the ALJ's opinion. Appellant now appeals to this court, arguing that there is no substantial evidence that his mental condition was not a result of the admitted 440-volt electrical shock. We affirm the denial of benefits.

■■ Our standard of review in workers' compensation cases is well-settled. We view the evidence and all reasonable inferences deducible therefrom in the light most favorable to the Commission's findings and affirm the decision if it is supported by substantial evidence. *Geo Specialty Chem. v. Clingan*, 69 Ark. App. 369, 13 S.W.3d 218 (2000). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Air Compressor Equip. v. Sword*, 69 Ark. App. 162, 11 S.W.3d 1 (2000). The issue is not whether we might have reached a different result or whether the evidence would have supported a contrary finding; if reasonable minds could reach the Commission's conclusion, we must affirm its decision. *Geo Specialty, supra*. It is the Commission's function to determine the credibility of witnesses and the weight to be accorded to each witness's testimony. *Watson v. Tayco, Inc.*, 79 Ark. App. 250, 86 S.W.3d 18 (2002).

At the hearing before the ALJ, John Hicks testified that after Arbaugh received the electrical shock he fell "on his can" in front of the line, and he thought Arbaugh was having a heart attack. He said that Arbaugh was so dazed that no one could communicate with him until they got him outside. Hicks described Arbaugh's condition as "his lights were on but he wasn't home," and said that when Arbaugh came back to work after the accident, he was just not himself.

John Wilson, another of Arbaugh's co-workers, testified that when Arbaugh pressed the button to reset the electrical switch, he saw a "big blue light" and then Arbaugh quickly fell back about five yards. He said that Arbaugh was not coherent for several minutes after the accident, and that there was a "definite difference" in Arbaugh after the accident, such as his motor skills were not the same, and that he walked, talked, and carried things more slowly.

Karen Arbaugh, appellant's mother, testified that before the accident, Arbaugh was "jolly" and was able to carry on a conversation without losing his train of thought. She acknowledged that prior to the accident, Arbaugh was using methamphetamines and was on the drug Paxil for depression, and that there were documented reports of alcohol abuse and his use of crank and marijuana; however, she said that he had been to rehabilitation for treatment and was, to her knowledge, no longer taking illegal drugs. She said that Arbaugh told her in the mid 1990s that he had been suicidal over the years, and she knew that he had attempted suicide in the past. She also knew that he had been battling depression since he was twelve or thirteen, when his grandfather passed away. She was aware that her son had behavioral problems in school and had not done well in his classes, but she denied knowing of any short-term or long-term memory problems, panic attacks, or hallucinations prior to the accident.

Ms. Arbaugh said that after her son was shocked, he would lose his train of thought and just sit there with a blank look. She worried because he was not getting any care from the company doctor for what she classified as seizures, where his eyes rolled back and most of his body was jerking. She said that after the accident, Arbaugh had a mark on one side of his face that looked like a burn and other marks on his arms that looked like bruises, but she did not know if those marks were caused by the electrical shock or by his subsequent fall. In his opinion, the ALJ held that, due to her awareness of Arbaugh's prior history of serious psychological and

substance-abuse problems, the weight to be given his mother's testimony was severely diminished when considering her testimony regarding the difference in Arbaugh's behavior after the work-related incident.

Arbaugh's wife, Alona, testified that he had used drugs prior to the accident, but that he had undergone rehabilitation and was doing well. She said that when she arrived at the doctor's office after the incident, her husband was whiter than she had ever seen him, he was shaking, and it took him a long time to answer her questions. She said that the company doctor, Dr. Leslie, told her that everything looked all right, that "electricity would either kill you or you would be okay." He told Alona that Arbaugh could return to work on Monday, which was only three days later.

Alona said that before the accident, Arbaugh was just "normal," but that he changed after the accident. She said that he could not stand for their two children to be in the room with him because their voices would make him "hit the floor." When he told her that he felt like his Paxil had stopped working, Alona took him to their family doctor, who increased his dosage of Paxil. She said that they had been to other doctors and that Arbaugh had done everything that he could to improve, but she did not know if there was much else that could be done. She said that one doctor told them that the recovery period was twelve to eighteen months, and that most of the brain recovery that could occur would happen within that time frame. Alona said that things had "leveled out," but that it had been a "roller coaster," with Arbaugh improving and then backsliding.

Alona described Arbaugh's seizures as "bad." She said that he had the first seizure about one month after the shock, and that the left side of his face went numb, his eyes rolled back in his head, and he started shaking and twitching. She said that the seizures would render him unconscious, and that when he would regain consciousness, he could not move for a long time. She said that the seizures are now "pretty well controlled" with Dilantin, but that he had never had seizures prior to the electrical shock. She also stated that Dr. John Towbin concluded that something was present on an EEG and that he had wanted to do further testing, but that Arbaugh "couldn't stand" to stay in the hospital, so no further testing was performed.

Arbuagh testified that on the day of the accident, he reached to turn on the line, felt a pull, saw a "blue light run up [his] arm," and then he fell to the floor. He attempted to return to work after

the accident for about one week, but he could tell that something was not right. He felt like his Paxil had quit working, he was angry, and he did not feel right. He was placed on Ativan, and he then checked into Charter Hospital.

Arbaugh said that he received a lot of therapy after the accident. He also said that he had seizures after the accident, but that he had not had any for a while. However, he claimed that he still had symptoms from the electrical shock, including anxiety, depression, and slower thinking. He said that he had seen Dr. Vann Smith, Dr. Betty Back, and Dr. Morse, and he tried to do what they told him to get better. He said that he has taken Clonovin, Vistaril, Ambien, Paxil, Neurontin, and Dilantin, but that he was currently only taking Effexor for depression.

Arbaugh acknowledged that he had previously been treated at Charter Hospital in 1997, at which time he realized that he had been depressed since his grandfather's death. He said that he had been on Prozac, but that the doctors at Charter placed him on Paxil instead. In 1996 and 1997, he had "serious problems" with methamphetamines, which led to suicide attempts. He also recounted two closed-head injuries he had sustained in the past, one at sixteen and another at twenty-one. He stated during the hearing that he had memory problems prior to the accident, although during his deposition he had denied any previous memory problems, and he acknowledged anxiety and panic attacks over the years. During the hearing, Arbaugh said that he had bruises on his back from when he fell after the accident and red lines on the back of his hand, but he had denied during his deposition that he had any bruises or scratches after the accident.

All of the medical testimony was by deposition. Dr. John Towbin, a seizure-disorder specialist, said that Arbaugh was referred to him because he was having "seizure-like events." Arbaugh described the seizures to Towbin as beginning with a sudden feeling of fatigue, followed by numbness in the left side of his face, particularly in his forehead. From there, a "pins and needles" feeling would spread across his face and eventually down his entire left side. Towbin opined that most of Arbaugh's symptoms were relatively unlikely as a manifestation of a seizure, as fatigue would be common after a seizure, not at the beginning, and because seizures do not cause negative symptoms, such as loss of some function; rather they usually cause positive symptoms, mak-

ing something move rather than stop moving. Towbin also said that most seizures are abrupt in their onset and offset and usually only last seconds or minutes.

Towbin said that he could not disprove someone having an electrical shock from a physical exam; however, he noted that on October 16, 2000, an EEG indicated that Arbaugh had a mild amount of slowing throughout all of the electrodes in the areas represented over the surface of the brain. Towbin said that Arbaugh had an event while he was recording the baseline EEG, and that throughout the episode, the EEG remained essentially unchanged; he interpreted this to mean that the electrical data was not consistent with an epileptic or seizure etiology. He said that after a seizure, there is typically a marked slowing of the brain-waves, and this slowing was not present after Arbaugh's event. For this reason, Towbin concluded that the spells Arbaugh was suffering from were non-epileptic and were a non-physiologic event.

Instead, Towbin opined that Arbaugh was having psychiatric events, stating that it was not uncommon for patients to have a precipitating event that might be a "hallmark" around which symptoms either develop or worsen; however, he stated that not being a psychiatrist, he did not know how to interpret the onset of the symptoms or whether to ascribe them to traumatic factors or to other life experiences. He disagreed with the company doctor's statement to Arbaugh that "electricity either kills you or you are going to be okay." Towbin did say that while it was possible to have a seizure disorder as a result of electrical injury, he thought that it would be hard to have such an injury that was substantial enough to result in cortical injury that caused seizures without that electrical injury doing other physical damage, such as burns in the skin, spinal cord sequelae, cardiac sequelae, or other brain-related phenomena. However, Towbin did not believe that an EEG was a particularly sensitive way to assess neuropsychological issues.

In his deposition, Dr. Gary Souheaver, a clinical neuropsychologist, stated that he had reviewed Arbaugh's records from 1997 forward. He opined that it was readily apparent from this review that Arbaugh had major psychiatric disorders, including suicide attempts, diagnosis of bipolar disorder, and major depression disorder recurrent. He also acknowledged Arbaugh's two previous closed-head injuries, stating that such injuries produced symptoms of personality disorganization, memory complaints, concentration difficulties, ease of fatigue, balance issues, and sometimes ringing in the ears. His major diagnosis was a differen-

tial between a bipolar disorder or a major depressive disorder recurrent; he saw no reason to resort to using an organic-brain disorder diagnosis because the symptoms could not be attributed to an underlying brain disorder. Souheaver stated that the test Dr. Towbin read suggested that whatever symptoms Arbaugh had could not reasonably be attributed to brain dysfunction.

Souheaver stated that he had read Dr. Vann Smith's reports, which inferred that because there was not cognitive dysfunction prior to the June 2, 2000 injury but that there were cognitive dysfunctions now, there was a brain injury; however, he disagreed with that conclusion. He said that Arbaugh clearly had cognitive complaints and symptoms with cognitive residuals related to a psychiatric disorder prior to the accident, and that cognitive dysfunction could occur for a number of reasons.

Souheaver also reviewed Dr. Betty Back's records, stating that he believed she relied on history and what Arbaugh told her rather than objective data. He diagnosed Arbaugh as having major depression and bipolar disorder, although he did not know the cause of the depression. However, he did not believe that the recurrent major depression, the bipolar disorder, and the mild cognitive disorder were totally unrelated to the electrical injury; he said that he was not saying that the electrical shock did or did not cause the injuries or whether the depression was worsened by the electrical shock.

Souheaver acknowledged that both Dr. Smith and Dr. Back had seen Arbaugh and diagnosed him with these problems as a result of the electrical shock. However, he opined that Arbaugh suffered from these problems prior to June 2000. He pointed out that Arbaugh was treated in 1998 at Charter Hospital for depression, and he opined that Arbaugh had been susceptible to depression since he was an adolescent, although he stated that the electrical shock could easily trigger depression. He agreed with Dr. Reginald Rutherford's IME except for the fact that Rutherford believed that Arbaugh was a malingerer, while he did not. He also noted that a person can have a cognitive disorder without a brain injury.

Dr. Vann Smith, a neuropsychologist, was also deposed. He said that neuropsychologists could better identify traumatic-brain injury, stating that such injuries were easily missed with a standard MRI and that CT scans missed ninety percent of those injuries. Smith also said that seventy percent of people with seizures appear

normal in an EEG. Smith referred to neuropsychological evaluations as the "gold standard" of measuring injury to the brain.

Smith said that he saw Arbaugh one time and then referred him to Dr. Michael Morse, who ordered an MRI and an EEG, both of which came back normal. Dr. Morse referred Arbaugh to his wife, Dr. Betty Back, a neuropsychologist, so that Smith's results could be compared to her results. Smith reported that from the Armstrong Smith Neurocognitive Status examination, he concluded that Arbaugh suffered moderate to severe impairment and that he had a traumatic-brain injury (TBI) from the electrical injury. Smith did not know if Arbaugh was moderately or severely impaired prior to the injury, but he opined that if he had those problems since 1997, it would have been much more obvious on the tests. Smith said that he believed that Arbaugh's problems with memory, attention, concentration, and executive function were causally related to his electrical injury. He opined that it would be impossible for Arbaugh to fake any of the problems that were indicated when he underwent Smith's testing, and he stated that Arbaugh was unemployable as a result of his injury due to a lack of concentration.

Dr. Betty Back-Morse, another neuropsychologist, diagnosed Arbaugh with TBI, noting slowed mental processing, memory problems, and sensory motor defects, although she did not know the source of the motor defects. She also believed that Arbaugh had a seizure disorder, with depression as a result of the disorder. However, she stated that a CT scan and an MRI were performed on Arbaugh, and both were normal. She also noted that an EEG performed by Dr. Towbin did not show change from the baseline activity and that there was no evidence of sharp activity. However, she stated that there was evidence of a brain injury by the cognitive impairment shown on the neuropsychological tests, and although the diagnostic testing did not clearly show the abnormalities, Arbaugh's history did not indicate the presence of neurocognitive or memory/attention/concentration problems prior to the electrical injury; therefore, she opined that his seizures and his problems were attributable to the accident because they did not exist prior to his injury. She stated that Arbaugh's healing period would end and his neurocognitive functioning would stabilize between twelve to eighteen months. She again reiterated that CAT scans, MRIs, and EEGs were not sophisticated enough

to detect a brain injury, and that neuropsychologists could determine such brain injuries more accurately and consistently than diagnostic testing.

Dr. Michael Morse, a neurologist, stated that he was treating Arbaugh for seizures and neuropathy in both arms. Morse opined that one of Arbaugh's EEGs was minimally abnormal due to diffuse slowing, which indicated cerebral dysfunction. He opined that all of the diagnostic testing could be misleading in Arbaugh's case because the diagnostic tests did not detect the changes in his body and therefore missed his problems. He also diagnosed Arbaugh with carpal-tunnel syndrome, which he said could have been caused by several factors, including electrical injuries, and he noted that Arbaugh had no complaint of carpal-tunnel when treatment began. However, he could not state within a reasonable degree of medical certainty that the carpal-tunnel was caused by the electrical injury. Nevertheless, he opined that, within a reasonable degree of medical certainty, Arbaugh's "spells" were related to his electrical injury.

The ALJ found, and the Commission affirmed and adopted, that appellant had failed to prove that his cognitive dysfunction and psychological problems were causally related to the June 2, 2000 incident or that they arose out of and in the course of his employment. He further found that appellant failed to establish that he had sustained a compensable organic-brain injury or a compensable psychological injury. Arbaugh now brings this appeal.

We first note that although Arbaugh contended at the hearing before the ALJ that he suffered both a psychological injury and an organic-brain injury as a result of the electrical shock, he appears to have abandoned the psychological-injury argument on appeal. However, he does argue on appeal that the Commission erred in finding that his organic-brain problems were not a result of his work-related accident. Because the June 2, 2000 injury was stipulated by the parties to be a compensable incident, the sole issue in this case is whether or not there is a causal connection between Arbaugh's brain dysfunction and the electrical shock he received at work on June 2, 2000.

In this case, as set forth in detail above, there were conflicting opinions between the numerous physicians Arbaugh saw as to whether or not his problems were related to his on-the-job injury. Furthermore, the ALJ found that appellant had

similar long-standing problems prior to his accident. The abstract is replete with indications of appellant's psychological and cognitive dysfunction problems prior to the June 2000 incident, including memory and concentration problems. It is the Commission's function to determine witness credibility and the weight to be afforded to any testimony; the Commission must weigh the medical evidence and, if such evidence is conflicting, its resolution is a question of fact for the Commission. *Searcy Indus. Laundry, Inc. v. Ferren*, 82 Ark. App. 69, 110 S.W.3d 306 (2003). The Commission's resolution of the medical evidence has the force and effect of a jury verdict. *Jim Walters Homes v. Beard*, 82 Ark. App. 607, 120 S.W.3d 160 (2003). Given this standard, we hold that there is substantial evidence to support the Commission's finding that appellant's problems were not causally related to the June 2000 incident.

We also note that, in their brief, appellees argue that the Commission had a substantial basis for finding that Arbaugh failed to prove a compensable carpal-tunnel injury. However, there was no finding made in the ALJ's opinion, which was adopted by the Commission, with regard to the carpal-tunnel syndrome diagnosis made by Dr. Morse. For this reason, we decline to address that issue.

Affirmed.

PITTMAN, GLADWIN, ROBBINS, BIRD, and ROAF, JJ., agree.

GRIFFEN, NEAL, and CRABTREE, JJ., dissent.

WENDELL L. GRIFFEN, Judge, dissenting. The majority would affirm on the ground that the evidence regarding the causal relationship between appellant's problems and his on-the-job injury was conflicting, and, as such, it was for the Commission, as the trier of fact, to weigh the evidence and resolve any conflicting evidence. However, we reverse where the Commission's order does not display a substantial basis for denial of relief. *Hill v. Baptist Med. Ctr.*, 74 Ark. App. 250, 57 S.W.3d 735 (2001). A substantial basis for denying relief exists if fair-minded persons could reach the same conclusion when considering the same facts. *Crudup v. Regal Ware, Inc.*, 341 Ark. 804, 20 S.W.3d 900 (2000). Because I believe fair minded persons would not reach the Commission's conclusions on the facts of this case, I would reverse and remand and instruct the

Commission to enter an award of benefits for appellant's organic-brain injury pursuant to Arkansas Code Annotated section 11-9-102(4)(A)(I) (Supp. 2001).

Our workers' compensation law does not preclude a finding that workers who have a pre-injury history of substance abuse and mental illness may suffer from a compensable injury. Nor does appellant's preexisting history of mental illness and substance abuse raise the evidentiary bar for his claim. However, the Commission's decision essentially reflects that prejudice. For example, despite citing Dr. Gary Souheaver's neuropsychological opinion that an electrical injury can trigger depression and that he did not believe appellant's problems were totally unrelated to the electrical shock of his compensable injury, the Commission found that appellant's prior history of psychological and cognitive problems, drug and alcohol abuse, suicidal attempts, and prior closed-head injuries somehow prevented him from proving that the June 2, 2000 incident produced compensable injuries. I am unable to affirm the Commission's disregard of competent medical proof of a compensable injury that is based upon such a prejudice.

The record fully demonstrates that appellant suffered an electrical shock at work on June 2, 2000. The record also documents that appellant had a pre-injury history of drug and alcohol abuse, mental health treatment, and depression. However, there is no evidence indicating that appellant had a pre-injury history for seizure-like symptoms of any kind, and certainly nothing similar to what the physicians who treated him after the June 2, 2000 incident recorded in their records. Moreover, there was no evidence that his prior symptoms affected his ability to work or were as pronounced as they were following the injury. Further, there was no evidence that appellant suffered from psychomotor retardation or had any difficulty in carrying on a normal conversation prior to his injury, but the testimony of appellant's family and former coworkers supports that appellant's personality, motor skills, and ability to think and respond all changed after the injury. In addition, appellant, his wife, and his mother testified that he experienced seizures after the injury and that he had never experienced seizures prior to the injury. Thus, the evidence demonstrates, that in addition to having similar symptoms, appellant also experienced *new* symptoms after the injury.

Even though the diagnostic tests generally produced no abnormal findings, three of appellant's treating physicians indicated that the diagnostic tests used were not the best tests to detect

a brain injury. It is inescapable that appellant received a 440-volt electrical shock to his system and that after that, he suffered from psychomotor retardation, poor concentration, and the inability to think clearly and carry on a conversation. Several doctors testified that appellant was unable to work; none of the doctors opined that appellant was able to return to work. In fact, it was estimated that his healing could take from eighteen months to three years. Clearly, as of the date he was injured, appellant was able to work and function normally. Appellee does not dispute that after the injury, appellant was not able to work and function normally. It seems a rather incredible coincidence that appellant's cognitive problems only reemerged or became exacerbated after he received a 440-volt electrical shock to his system.

The causal connection between appellant's injury and his need for treatment is further established by the testimony of appellant, his coworkers, his mother, and his wife. The Commission made no findings regarding the veracity of appellant or his wife, but the ALJ, and thus, the Commission, disregarded the testimony of appellant's co-workers and mother for reasons that are contradicted by the record or seem arbitrary. While this court normally does not reexamine the ALJ's findings, it is necessary to do so where the Commission makes no independent finding and instead, adopts the ALJ's findings in full. *Freeman v. Con-Agra,* 344 Ark. 296, 40 S.W.3d 760 (2001). The ALJ stated that the coworkers were unable to explain the difference in appellant before and after the injury except that to testify that he was like a completely different person. This statement is simply untrue. John Hicks, one coworker, specifically testified that before the accident, appellant was happy and easy to get along with, but when appellant came back after the injury, he would not talk to anyone. John Wilson, the other coworker, specified the difference in appellant in greater detail. Wilson stated that, "there was a definite difference in Kent [appellant]. His motor skills weren't the same. The way he walked, talked, speech, and carried things was slower. It took him a minute to figure out what people are saying to him." In addition, Wilson testified that he saw appellant a few weeks before the hearing and that appellant still had problems thinking and talking. Thus, the stated reason for rejecting the testimony of Hicks and Wilson is contradicted by the record.

Further, the Commission's discounting of the testimony of Ms. Arbaugh, appellant's mother, seems arbitrary and counterintuitive. The ALJ determined that Ms. Arbaugh's testimony should

be "severely diminished" because Ms. Arbaugh was aware of appellant's history of serious psychological and substance-abuse problems. This simply makes no sense because the only person who can credibly comment on the change in a claimant's physical and emotional state is a person who knew the claimant prior to the injury. The fact that Ms. Arbaugh was not aware that appellant had concentration problems prior to his injury is consistent with her testimony that, prior to the injury, he could carry on a conversation without losing his train of thought. It would make more sense to discount Ms. Arbaugh's testimony if she appeared to be lacking in veracity (which the ALJ did *not* find) or if she had *no* knowledge of appellant's prior history (which was clearly not the case). Morever, neither the ALJ nor the Commission seemed to discount appellant's or Mrs. Arbaugh's testimony regarding the change in his physical and mental condition before and after the injury.

It is true that appellate courts normally defer to the Commission on issues involving the weight of the evidence and the credibility of witnesses. *Freeman v. Con-Agra Frozen Foods, supra.* However, while the Commission may be insulated to a certain degree, it is not so insulated as to render appellate review meaningless. We have held that the Commission may not arbitrarily disregard the testimony of any witness. *Freeman v. Con-Agra Frozen Foods, supra.* Where the uncontradicted testimony of even an interested witness is unaffected by any conflicting inferences to be drawn from it, and is not improbable, extraordinary or surprising in its nature or there is no other ground for hesitating to accept it as truth, there is no reason for denying the finding of verity dictated by such evidence. *Maloy v. Stuttgart Mem'l Hosp.* 316 Ark. 447, 872 S.W.2d 401 (1994); *McLarty Leasing Sys., Inc. v. Blackshear,* 11 Ark. App. 178, 668 S.W.2d 53 (1984). Here, the testimony regarding the change in appellant's physical and emotional state is uncontradicted, is not improbable, extraordinary, or surprising, and there appears to be no reason to discount or disregard it.

For the above reasons, I would reverse the Commission's order in this case. I am authorized to state that Judges NEAL and CRABTREE join in this opinion.