DECISION
Before this Court are two motions in limine filed by Maria Miranda ("Plaintiff"), one motion in limine filed by Francisco and Philomena DaCruz ("Defendants"), and one motion for summary judgment / in limine filed by Defendants. Defendants have not filed an objection to either of Plaintiff's motions. Plaintiff objects to both of Defendants' motions. For the reasons discussed herein, this Court grants Plaintiff's motion to limit the testimony of Defendants' expert, Dr. Nancy Hebben ("Dr. Hebben"), and grants, in full, Plaintiff's motion to strike certain inadmissible statements from Dr. Hebben's written report. This Court denies Defendants' motion to exclude Dr. John Rosen ("Dr. Rosen"). Finally, this Court grants Defendants' motion, construed as a motion inlimine, regarding the costs of future medical monitoring and prohibits any testimony on the necessity of such monitoring.
 I Facts and Travel
This matter arises out of the alleged lead paint poisoning of Alexandro Murillo[1] ("Murillo") while he was a tenant at Francisco and Philomena DaCruz's ("Defendants") owner-occupied dwelling located at 8 Star Street in Pawtucket, Rhode Island. (Compl. ¶ 2.) Murillo *Page 2 
was born on January 18, 1997 in Providence, Rhode Island and lived at the Star Street address with his mother Maria Miranda (Plaintiff) and father Roberto Murillo during all time periods relevant to this action. (Compl. ¶ 4.) On or about August 2, 1999, Murillo was diagnosed with lead poisoning (Compl. ¶ 7.) Thereafter, on or about August 27, 1999, the Rhode Island Department of Health inspected 8 Star Street and confirmed the existence of lead paint exposure hazards throughout the dwelling. (Compl. ¶ 8.) As a result, the Rhode Island Department of Health issued a Notice of Violation to Defendants on or about September 27, 1999. (Compl. ¶ 9.) The Notice cited Defendants' property at 8 Star Street for violations of the Lead Poisoning Prevention Act (G.L. 1956 § 23-24.6 etseq.), Rules and Regulations for Lead Poisoning Prevention (R23-24.6-PB) and Housing Maintenance and Occupancy Code (G.L. 1956 § 45-24.3 et seq.). (Compl. ¶ 9.) Accordingly, Plaintiff, on behalf of Murillo, filed this Complaint in Superior Court on April 26, 2004. Plaintiff's Complaint charges Defendants with "Negligence" (Count I), "Negligent Misrepresentation and Omissions" (Count II), and seeks, inter alia, "Punitive Damages" (Count III). However, on September 21, 2009, the parties agreed to dismiss Count III with prejudice. This Court entered an order to this effect.
This Court heard oral argument for Defendants' motion for summary judgment / motion in limine regarding the costs of future medical monitoring on August 31, 2009; Defendants' motion to exclude Dr. Rosen on September 8, 2009; and Plaintiff's motion to limit Dr. Hebben on September 11, 2009. This Court did not hear oral argument regarding Plaintiff's motion to strike certain parts of Dr. Hebben's report. Although the parties also submitted motions regarding Dr. Theodore Lidsky and Dr. Nancy Frieder's testimony and Dr. Frieder's written report, this Court need not decide those motions at this time. Defendants withdrew their motion *Page 3 
to exclude Dr. Lidsky on the record and Defendants are proposing an order on Dr. Frieder, which is still pending.
 II Analysis A Applicable Law 1 Motions in Limine
"A motion in limine is `widely recognized as a salutary device to avoid the impact of unfairly prejudicial evidence upon the jury and to save a significant amount of time at the trial.'"BHG, Inc. v. F.A.F., Inc., 784 A.2d 884, 886 (R.I. 2001) (quoting Ferguson v. Marshall Contractors, Inc.,745 A.2d 147, 150 (R.I. 2000)). It is not "intended to be a dispositive motion," rather "`it has been used in this state primarily to prevent the proponent of potentially prejudicial matter from displaying it to the jury in any manner until the trial court has ruled upon its admissibility in the context of the trial itself.'" Id. (quoting Ferguson, 745 A.2d at 150-01).
 2 Expert Witness Testimony
All four of the instant motions request this Court to act as a gatekeeper to bar all or parts of various expert witnesses' testimony. In Rhode Island, the trial court decides whether an expert is permitted to testify, a decision that is afforded much deference. See R.I. R. Evid. 104; Raimbeault v. TakeuchiManufacturing Ltd., 772 A.2d 1056, 1061 (R.I. 2001) (quotingGallucci v. Humbyrd, 709 A.2d 1059 (R.I. 1998)) (stating that "[t]his Court will not disturb a trial justice's ruling on the admissibility of expert testimony absent an abuse of discretion"). Before an expert is permitted to testify, the trial court applies Rhode Island Rule of Evidence 702, commonly referred to as theDaubert test, to determine whether the witness is able to clear two evidentiary hurdles: (1) he or she has applicable expert qualifications and (2) he or she will impart reliable *Page 4 
and relevant expert testimony that will assist the trier of fact.See Raimbeault, 772 A.2d at 1061 (holding that Daubert v. Merrell Dow Pharm., Inc.,509 U.S. 579, 589 (1993), applies to scientific testimony in Rhode Island state courts). A party must prove by a preponderance of the evidence that its expert can meet these two requirements.DePetrillo v. Dow Chem. Co., 729 A.2d 677, 689 (R.I. 1999).
First, the proponent party must show that its witness qualifies as an expert in the applicable subject matter "by [his or her] knowledge, skill, experience, training, or education."R.I. v. Botelho, 753 A.2d 343, 347 (R.I. 2000) (citing R.I. R. Evid. 702). Second, even if qualified as an expert, a witness may only testify to "scientific, technical or other specialized knowledge that will assist the jury in understanding the evidence or in determining a fact issue." Id.
(citing R.I. R. Evid. 702). In deciding whether an expert has met this second requirement, the trial court examines "whether the testimony sought is relevant, within the witness's expertise, and [reliable] based on an adequate factual foundation."R.I. v. Bettencourt, 723 A.2d 1101, 1112 (R.I. 1999);see Raimbeault, 772 A.2d at 1056 (stating that R.I. R. Evid. 702 and Daubert aim to "ensure that any and all scientific testimony or evidence admitted [is] not only relevant, but [also] reliable"); see also
R.I. R. Evid. 401 (explaining that relevant evidence is evidence that makes a material fact "more probable or less probable than it would be without the evidence"). In order for the trial court to evaluate whether the proposed testimony is reliable, the expert must explain how he or she reached his or her opinion and the factual, scientific basis supporting his or her conclusions. SeeGorham v. Public Building Auth. of Providence,612 A.2d 708 (R.I. 1992); see also
R.I. R. Evid. 705 (generally requiring the disclosure of facts or data underlying an expert opinion). Overall, "[t]he critical inquiry . . . is whether the expert testimony reflects scientific knowledge that can be tested by scientific experimentation and whether the expert *Page 5 
testimony logically advances a material aspect of the plaintiff's case." Raimbeault, 772 A.2d at 1061; see alsoDePetrillo, 729 A.2d at 689 (stating that admissible expert testimony is "scientifically valid and . . . `fits' an issue in the case"). Finally, as with all evidence, the trial court must ensure that the probative value of the expert testimony does not pale against the "danger of unfair prejudice" if the testimony is admitted. R.I. R. Evid. 403(b).
 B Plaintiff's Motions 1 Plaintiff's Motion in Limine To Limit the Testimony of Dr. NancyHebben, Ph.D.
Plaintiff has filed a motion in limine to limit the testimony of Defendants' neuropsychologist expert, Dr. Hebben, to "her education, background and the result of [Murillo's] neuropsychological testing performed by her." (Pl.'s 1st Hebben memo at 2.) Plaintiff argues that Dr. Hebben "lacks the necessary education, training and experience to qualify her to offer any expert opinion with respect to the effect of lead generally or specifically on the minor plaintiff in this matter."Id.[2] This Court agrees with Plaintiff and grants her motion.
In a toxic tort case, it is necessary for the plaintiff to prove by a preponderance of the evidence both general and specific cause for the medical condition suffered by the plaintiff. 3 Faigman, Kaye, Saks Sanders, Modern ScientificEvidence § 23:2, at 5 (2005-2006 ed.). "General causation asks whether exposure to a substance causes harm to anyone. Specific causation asks whether exposure to a substance caused a particular plaintiff's injury." Id. In the instant case, it appears that Defendants want Dr. Hebben to refute both types of causation related to Murillo's condition. With respect to general cause, she intends to assert that it is extremely *Page 6 
unlikely that "a blood lead burden in the absence of symptology — typically seen at blood lead level of 70-80 µ g/dl — can cause any cognitive injury." (Pl.'s 1st Hebben memo at 6.) Dr. Hebben will also testify relative to specific cause, namely that "Murillo's elevated blood [lead] levels had no effect on his cognitive development." Id.
Plaintiff asserts that Dr. Hebben is unqualified to present these opinions and theories. Id. at 2.
As Plaintiff emphasizes, Dr. Hebben has no clinical experience or significant training in the fields of lead epidemiology, toxicology or pediatric medicine, nor has she published a single, peer-reviewed article on her lead poisoning theories. Id. at 4-6. Perhaps most telling, is the abundance of scholarly, scientific, and legislative publications that directly contradict her opinion that cognitive effects are absent unless there are physical manifestations of lead poisoning (for example, encephalopathy). In fact, Plaintiff's memo includes a bibliography of 67 sources that support the scientific opinion that lead levels as low as 10 µ g/dl are associated with maladies in cognitive function.[3]
(Pl.'s Hebben memo Appendix); see, e.g., American Academy of Pediatrics Policy Statement, Lead Exposure inChildren: Prevention, Detection and Management, 116 Pediatrics 1036-46 (Oct. 2005) (stating that lead levels of 10 µ g/dl and below are correlated with a decrease in IQ). Dr. Hebben, conversely, cannot point to a single, up-to-date source that supports her position.[4] (Pl.'s 1st Hebben memo at 6 n. 5.)
Because Dr. Hebben is a neuropsychologist who lacks any training or experience in lead toxicology, lead poisoning epidemiology, or pediatric medicine, this Court finds no justification for allowing her to testify to the specific cause of Murillo's injuries.See In re Alexis L., *Page 7 972 A.2d 159, 169 (R.I. 2009) (holding that an expert witness must have "sufficient training and experience upon which to base an opinion"). In addition, this Court finds her theories on lead poisoning general causation to be so significantly outside the mainstream of medical acceptance and completely lacking factual basis, that allowing her to present her opinion would serve only to confuse the jury.See In re Mackenzie C., 877 A.2d 674, 883-84 (R.I. 2005) (quoting Owens v. Silvia,838 A.2d 881, 891-92 (R.I. 2003) (explaining that a "novel theory" that "has [not] been or can[not] be tested . . . has [not] been the subject of peer review and publication . . . does [not] have a known or potential rate of error . . . and that has [not] gained general acceptance in the scientific community" is inadmissible);DiPetrillo, 729 A.2d at 688 (asserting that the trial court must scrutinize the reliability of an expert witness's underlying principles and methodology due to the danger that the expert will confuse or mislead the jury); see alsoR.I. v. Motyka, 893 A.2d 267, 280 (R.I. 2006) (stating that "expert testimony based upon novel scientific evidence" is admissible if it will "assist the trier of fact"). Accordingly, this Court grants Plaintiff's motion to prohibit Dr. Hebben from discussing her lead poisoning theory and the effect of lead on Murillo's cognitive development before the jury. She may explain to the jury her educational background and describe the neuropsychological evaluation she conducted on Murillo on December 17, 2008; however, this Court will limit this testimony as well. See infra.
 2 Plaintiff's Motion in Limine To Strike Irrelevant References and Unqualified Opinionsin Neuropsychological Evaluation of Nancy Hebben, Ph.D.
Plaintiff's second motion with respect to Dr. Hebben requests this Court to strike certain parts of Dr. Hebben's seventeen-page neuropsychological evaluation of Murillo, which was conducted on December 17, 2008. In her memo, Plaintiff specifically enumerates the passages that she argues are irrelevant and prejudicial. (Pl.'s 2nd Hebben Memo at 1-2.) She also argues *Page 8 
that several passages are unacceptable for Dr. Hebben to testify about because they contain references to medical conditions and causes of liability, which Dr. Hebben is unqualified to discuss.Id. at 3. This Court agrees with Plaintiff's arguments regarding irrelevance, prejudice, medical conditions and liability. Accordingly, this Court grants Plaintiff's motion in full.
The two basic characteristics of admissible evidence are relevance and the lack of an undue prejudicial effect. See
R.I. R. Evid. 401 (relevant evidence is evidence that makes a material fact "more probable or less probable than it would be without the evidence"); R.I. R. Evid. 403 (relevant evidence may be excluded if its probative value is outweighed by its prejudicial effect). "The trial justice must exercise his or her discretion to exclude evidence sparingly, because only evidence that is `marginally relevant and enormously prejudicial' must be excluded."R.I. v. Dominick, 968 A.2d 279 (R.I. 2009) (quotingR.I. v. Patel, 949 A.2d 401, 412-13 (R.I. 2008)).
Clearly, this Court finds that all of the statements listed in Plaintiff's memo under the first heading "Irrelevant and Prejudicial References" should be stricken. They are not relevant to this case and are "enormously prejudicial." Id. To name a few examples, it is beyond this Court's imagination why Murillo's father's traffic citation, Murillo's parents' family planning decisions, Murillo's mother's (Plaintiff) HIV+ status, Murillo's breakfast and lunch habits, Murillo's Cape Verdean mosquito bites or Murillo's mother (Plaintiff) forgetting to attend a parent-teacher conference have the slightest relevance to Murillo's cognitive abilities or a neuropsychological evaluation, which tests "different kinds of abilities such as problem solving, attention, memory, language and motor skills." Univ. of Virginia Health Sys., Dept. of Neurology, "What is a Neuropsychological Evaluation Like?," http://www.healthsystem.virginia.edu/ internet/neurology/what_we_treat/neuropsychology/ (last visited Oct. 15, 2009) [hereinafter UVA Dept. of *Page 9 
Neurology]. Similarly, details about Murillo's parents' own education, their primary languages, previous marriages and their relationships with their other children are not sufficiently relevant to the instant case to outweigh the strongly prejudicial effect on the jury. Accordingly, all listed passages in this section of Plaintiff's memo are inadmissible by Defendants' witness, Dr. Hebben.
Moving on to "Medical References," this Court also finds it inappropriate for Dr. Hebben to mention or discuss Murillo's May 14, 2007 visit to Memorial Hospital to rule out a seizure. (Pl.'s 2nd Hebben memo at 3.) While Murillo was at the hospital, doctors performed a CT scan on his brain. As stated above, Dr. Hebben is a neuropsychologist, not a medical doctor. Neuropsychologists, "who specialize in assessing and treating the cognitive and emotional needs of patients suffering from neurological disorders or conditions, such as Alzheimer's disease, brain injury, or brain tumors," do not necessarily review CT scans when conducting neuropsychological evaluations or making their diagnoses. See UVA Dept. of Neurology.[5]But see Arbaugh v. AG Processing, Inc.184 S.W.3d 53, 58-59 (Ark. App. 2004) (allowing a neuropsychologist to mention that a "CT scan and an MRI were performed on Arbaugh, and both were normal"); Tenn. v. Barnett,909 S.W.2d 423, 425 (Tenn. 1995) (stating that "[t]he physician interpreting the results agreed with the neuropsychologist that the CT scan would not detect subtle abnormalities"). Although neuropsychologists may be familiar with CT scans of the human brain,see generally David G. Andrewes Neuropsychology: FromTheory To Practice xii (2001) (stating that neuroimaging methods are used in modern neuropsychology research), it is *Page 10 
rare for neuropsychologists to read and interpret patients' scans, which are ordinarily done by a radiologist. Univ. of Washington, Dept. of Radiology, Head CT Scan, http://www.rad.washington.edu/clinical/patinfo/ct/head-ct-scan (last visited Oct. 16, 2009) ("A radiologist skilled in CT scanning will review and interpret the CT findings, and will send a detailed report to your primary care or referring doctor.") Accordingly, this Court finds that Dr. Hebben's Ph.D. in neuropsychology, without more, does not qualify her to discuss the details of the CT scan and Murillo's final diagnosis of febrile seizure and viral syndrome. (Pl.'s 2nd Hebben memo at 3.) There is nothing in the record that indicates Dr. Hebben has training or experience reading CT scans, nor was she collaborating with Murillo's treating physician or neurologist at the time this scan was taken at Memorial Hospital.See Torrado v. Santilli, 776 A.2d 1059, 1060 (R.I. 2001) (finding that a registered nurse who "worked full-time as a psychotherapist and maintained a part-time therapy practice out of her home" could not testify about post traumatic stress disorder because she "had never published articles in the area of post-traumatic stress disorder, was not a licensed psychologist or social worker, and had not worked with a medical doctor orpsychiatrist when she treated plaintiff") (emphasis added). As the court in Torrado found with respect to its expert, this Court also finds that Dr. Hebben's Ph.D. in neuropsychology, without more, is insufficient to qualify her to discuss Murillo's CT scan and seizure diagnosis.
Finally, this Court finds that Dr. Hebben is not allowed to testify about any of the "Liability References" listed in Plaintiff's memo. (Pl.'s 2nd Hebben memo at 3.) Dr. Hebben's expertise does not qualify her to speculate about lead paint liability, nor did she personally view the lack of peeling paint or the newness of the 8 Star Street apartment. See Franco v.Latina, 916 A.2d 1251, 1258 (R.I. 2007) (stating that admissible expert "opinion elicited [must have] probative force [and cannot be] merely speculative"); Skene v. Beland, 824 A.2d 489, 492 (R.I. *Page 11 
2003) (disallowing expert testimony that was too speculative and lacked evidentiary support). Likewise Dr. Hebben cannot testify to the hearsay statement that Murillo's parents "did not see [him] as having any problems related to lead." (Pl.'s 2nd Hebben memo at 3.) Again this is speculative and lacks any evidentiary support. Clearly, Murillo's parents lack the ability to make the assessment of whether Murillo's cognitive functions were affected by lead paint. Accordingly, all references to liability listed in Plaintiff's memo are inadmissible also.
 C Defendants' Motions 1 Defendants' Motion in Limine To Exclude the Testimony and Report of Plaintiff's Designated Expert, Dr. John Rosen, M.D.
Defendants request this Court to exclude Dr. Rosen's testimony on general and specific causation. (Defs.' Rosen memo.) They argue that Dr. Rosen does not have the proper qualifications to give reliable testimony on lead poisoning or differential diagnoses.Id. at 12-13. They also argue that Dr. Rosen has not cited any relevant epidemiology or toxicology texts to support Plaintiff's contention that the dosage and duration of lead exposure experienced by Murillo can and did produce the singular cognitive effect (diminished Verbal IQ) Murillo exhibits. Id. at 13-14. Further, Defendants challenge Dr. Rosen's differential diagnosis methodology. Id. at 14. They argue that he did not provide a detailed explanation of how he "ruled in" and "ruled out" the potential causes for Murillo's cognitive deficit and instead made the unjustified conclusion that lead was the specific cause.Id. 14-15.
Plaintiff intends to have Dr. Rosen provide the jury with a general explanation of "the harmful effects of lead on the human body and especially on children, the matter in which children are poisoned by lead, the sources of lead poisoning and the pertinent scientific and historical literature regarding lead poisoning." (Pl.'s Supp. Res. To Def.'s Interrog.) Dr. Rosen *Page 12 
will also explain specific causation. He will testify "within a reasonable degree of medical certainty that [Murillo] was lead poisoned and that lead poisoning has caused his serious, permanent and irreversible injuries." Id. Dr. Rosen also will state that the lead exposure occurred at Defendants' 8 Star Street property, which exceeded Rhode Island's regulatory limits for lead during the time Murillo was a tenant there. Id. Plaintiff explains that Dr. Rosen will rely on Murillo's medical, school and other pertinent records to make this assessment. Id. He will also base his testimony on the Rhode Island Department of Health lead inspection records and records of other inspections conducted at the property. Id.
After reviewing the record, this Court finds that Dr. Rosen is both qualified as an expert and presents reliable support for his opinions. As Plaintiff reports, Dr. Rosen is a pediatrician with thirty years experience treating lead poisoned children. (Pl.'s Expert Opp'n Combined memo at 25.) He is the Director of the Division of Environmental Sciences at the Children's Hospital at Montefiore at the Albert Einstein College of Medicine, which boasts the largest treatment program for lead poisoned children in the United States, and is a Professor of Pediatrics at the hospital as well. Id. Since he began his career, Dr. Rosen has treated over 30,000 lead poisoned children and is involved in the current treatment of 1,500 children.Id. He has designed medical monitoring programs for adults and children affected by United States' Superfund sites where lead was the primary contaminant and has also advised the United States Department of Justice and the United States Environmental Protection Agency on the immediate and latent effects of lead exposure. Id. at 26. He is a frequently published author on the subject of childhood lead poisoning in the nation's top medical journals and was appointed to serve as the Chairperson of the Center for Disease Control's Advisory Committee on Lead Poisoning Prevention in both 1984 and 1991.Id. at 27. Additionally, impressive is the National Institute of *Page 13 
Health's funding of Dr. Rosen's research on lead poisoning for the last 32 years. Id. Accordingly, this Court is satisfied that Dr. Rosen is qualified as a lead poisoning expert based on his education, experience, training, and knowledge of the applicable subject matter.
Further, this Court finds that Dr. Rosen's testimony provides a fact supported, scientific explanation of the general causes and effects of lead poisoning based on his many years of research and experience. Id. at 28. Additionally, Defendants' characterization of Murillo's impairments as a singular cognitive effect and the suggestion that there is no literature to support such a targeted deficiency caused by lead poisoning are plainly incorrect. Id. First, Murillo exhibits not a singular deficiency, but rather a variety of cognitive deficits including weaknesses in "language fluency, verbal reasoning, word reasoning, sustained attention, sentence comprehension and intra-and inter-scatter." Id. Second, Dr. Rosen explains that "childhood lead poisoning can produce one orseveral cognitive impairments that reflect brain damage in a child," an observation that is supported by other lead poisoning experts. Id. at 29 (emphasis added). Accordingly, Dr. Rosen is qualified to give his expert opinion that lead poisoning is a general cause of cognitive deficiencies.
This Court is also satisfied that Dr. Rosen provides a well-reasoned, factually-supported, scientific rationale and methodology for his opinion that Murillo's cognitive deficits were specifically caused by lead poisoning. Dr. Rosen's deposition reveals that he conducted a differential diagnosis of all possible causes of Murillo's cognitive impairment based on his "medical records, blood lead levels, environmental history and neuropsychological assessments." Id. A differential diagnosis is an accepted way of proving specific causation. SeeMcGovern v. Brigham Women's Hosp.,584 F. Supp. 2d 418, 426 n. 8 (D. Mass. 2008) (quotingWestberry v. Gislaved Gummi AB, 178 F.3d 257, 262 (4th Cir. 1999)) ("differential diagnosis is a `standard *Page 14 
scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated'"). Dr. Rosen explains that no other causes of brain injury, lead poisoning, or cognitive deficits appear in the record besides the lead paint that was present in Murillo's childhood home and violated a number of Rhode Island statutes. Id. Despite Defendants' argument that Dr. Rosen's explanation of his methodology lacks enough detail to evaluate its soundness; this Court finds that his statements on differential diagnosis are sufficient to pass the gatekeeper's muster. Defendants remain free to cross-examine Dr. Rosen to cast doubt on his methods and conclusions. As such, Defendants' motion to exclude Dr. Rosen's testimony on specific and general causation is denied. Dr. Rosen may testify as intended; however, this Court will exclude Dr. Rosen from testifying that Murillo requires indefinite medical monitoring. Seeinfra.
 2 Defendant's Motion for Summary Judgment/Motion in Limine To Exclude Evidence Concerning the Costs of Medical Monitoring
Defendants also object to Plaintiff's use of Dr. Rosen's testimony to persuade the jury to award medical monitoring damages. (Defs.' Medical Monitoring memo.) Basically, Dr. Rosen will opine that childhood lead poisoning not only leads to cognitive deficits, but also can result in other adverse medical conditions later in life. Id. at 2 (quoting Dr. Rosen's March 11, 2009 Report). For example, Dr. Rosen asserts that because of Murillo's lead exposure, he is now in a much higher risk category for "kidney disease, peripheral neuropathy, hypertension, and cardiovascular disease." Id. To combat and forestall these potential effects, Dr. Rosen recommends a medical monitoring program costing "$3000 annually through age 18 and about $5000 annually from age 19 for the rest of his life." Id. Defendants argue that Rhode Island case law does not support awarding damages for medical monitoring if the plaintiff only has the *Page 15 
potential to contract the medical conditions. Id. They request this Court to grant summary judgment because there are no material facts in dispute — there is no argument that Murillo does not have these physical conditions currently — and therefore they are entitled to judgment as a matter of law because Rhode Island law does not support awarding medical monitoring damages for the mere potential of future harm. Id. See
Super. R. Civ. P. 56. Alternately, in their motion inlimine, Defendants request this Court to exclude evidence on medical monitoring as it will mislead and prejudice the jury to award damages that Rhode Island does not recognize. Id. This Court agrees with Defendants' argument and will exclude any evidence from Dr. Rosen or Plaintiff's other witnesses on the necessity of medically monitoring Murillo.
Because summary judgment is used to grant a party total relief on a particular cause of action — for example, negligence — it is inappropriate to use this legal tool to suppress evidence on apart of an element of that cause of action — in this instant case, the extent of damages. See Franklin-Mason v.Penn, ___ F.R.D. ___, No. 03-945, 2009 WL 1931151 at *2 (D.D.C. July 7, 2009) (holding that Federal Rule of Civil Procedure 56 [which is identical to Rhode Island Rule 56] does not permit a party to "file a motion for partial summary judgment on a fact or an element of a claim");Evergreen Int'l v. Marinex Const. Co.,477 F. Supp. 2d 697, 698-99 (D.S.C. 2007) (stating that a plaintiff was not entitled to summary judgment when plaintiff was "seeking a determination that these amount of damages are not in genuine dispute, [because Plaintiff] does not attempt to dispose of any particular claim in its entirety"); Saylor v. Fayette R. Plumb,Inc., 30 F.R.D. 176, 180 (E.D. Pa. 1962) (stating that Rule 56 "does not contemplate partial summary judgment as to a portion of a single claim"). Defendants do not challenge the existence ofall damages, which could arguably cancel a required element of the negligence action and thereby dispose of the claim in its entirety. Rather, they only challenge a portion of *Page 16 
the damages, making summary judgment procedurally improper. Nonetheless, this Court will construe Defendants' submittal in their alternate motion in limine form and grant it as such.
Defendants properly state that the law in Rhode Island allows plaintiffs to recover "present damages for future apprehended consequences upon a showing that such consequences are reasonably certain to ensue." Pescatore v. MacIntosh,113 R.I. 139, 148 n. 5, 319 A.2d 21, 26 n. 5 (R.I. 1974). Plaintiffs must establish the "nature and extent" of present damages based on "legally competent evidence" and not based on "speculation or conjecture." White v. Leclerc, 444 A.2d 847, 850 (R.I. 1982). "Although mathematical exactitude is not required, the damages must be based on reasonable and probable estimates." Id. Here, Dr. Rosen and Plaintiff state the cost of future medical monitoring with a reasonable amount of certainty; however, Dr. Rosen can only speculate regarding likelihood and timeframe that Murillo will contract a future medical condition. (Defs.' Medical Monitoring memo at 4) (quoting Dr. Rosen's March 11, 2009 Report). Defendants suggest that Kelley v. Cowesett Hills Association strongly weighs against awarding Plaintiff damages for medical monitoring in this case. 768 A.2d 425, 430 (R.I. 2001). The Kelley Court held that a plaintiff's exposure to asbestos did not create a viable negligence cause of action because there was no physical manifestation of injury and the only requested damages were compensation for medical monitoring. Id. at 430. The court acknowledged that "exposure to a carcinogen, although potentially increasing one's risk of developing cancer, is too tenuous to be a viable cause of action." Id. Like the Kelley plaintiff, Defendants argue that Murillo also does not have any manifestation of the physical conditions that Dr. Rosen states are higher risk, which makes an award of medical monitoring damages unacceptable. The Defendants also point to Pescatore, wherein the Rhode Island Supreme Court allowed a plaintiff to recover for current injuries from a car accident and also for future dental work that was *Page 17 
certainly necessary. 113 R.I. at 149, 319 A.2d at 26-27. Defendants contend that Pescatore militates against Plaintiff's request for medical monitoring damages because unlike the necessary dental work in Pescatore, it is far from certain that Murillo will require future medical care due to his lead exposure. Finally, Defendants suggest that this Court should adopt the rationale inMetro-North Commuter Railroad v. Buckley,521 U.S. 424, 439 (1997). In that case, the United States Supreme Court did not permit the plaintiffs to recover under a cause of action for medical monitoring because they did not have any symptoms of the disease. The Court was concerned that "tens of millions of individuals may have suffered exposure to substances that might justify some form of substance-exposure-related medical monitoring" and permitting plaintiffs to recover solely on this basis would "threaten a `flood' of less important cases" and "unlimited and unpredictable liability." Id. at 442. Defendants argue that affording Murillo the opportunity to recover medical monitoring damages would set a dangerous precedent in this Court.
Plaintiff, however, reminds this Court that the instant negligence cause of action is not based on medical monitoring damages alone. Unlike the plaintiff in Kelley, Plaintiff is requesting damages for Murillo's exhibited cognitive deficiencies and only seeks to augment these stated damages with the additional costs of future monitoring. (Pl.'s Opp'n Medical Monitoring memo at 4, 6.) Plaintiff argues that she can prove that Murillo was lead poisoned and this indicates, with a reasonable degree of medical certainty, that he has an increased risk of future physical harms.Id. at 6. In opposing Defendants' motion in limine, Plaintiff focuses on Dr. Rosen and his expert opinion that health issues aside from cognitive deficiencies often occur as a result of lead poisoning. Id. 5-14. He cites several public health treatises that "indicate the direct consequences of lead poisoning can become apparent as an adult [physical malady]."Id. at 7. Plaintiff, however, does not cite any case law where a Rhode Island court (or any court) *Page 18 
allowed medical monitoring for a possible, yet unmanifested, future harm. Nevertheless, Plaintiff argues that Murillo should be compensated for his heightened risk, which is derivative of leading poisoning and therefore caused by Defendants' alleged negligence.
This Court is not persuaded to open the damages flood gates to indefinite future monitoring. Although Murillo arguably has a heightened risk of future harm due to his lead exposure, he currently does not exhibit any indication that the risk is manifesting into actuality. Over the course of his lifetime, Murillo will be exposed to a number of causative factors for "kidney disease, peripheral neuropathy [a nerve disorder, often caused by diabetes], hypertension, and cardiovascular disease." (Defs.' Medical Monitoring memo at 2) (quoting Dr. Rosen's March 11, 2009 Report). It is patently unfair to saddle Defendants with the cost of indefinite monitoring considering Murillo does not exhibit any present harm and there are numerous other superseding causes for these conditions.
In closing, this Court duly notes Plaintiff's and Defendants' supplemental responses to this evidentiary issue. In their memos, both parties herald the Massachusetts Supreme Judicial Court's recent decision, Donovan v. Philip Morris USA, Inc., as favoring their position. ___ N.E.2d ___, No. SJC-10409, 2009 WL 3321445 (Mass. Oct. 19, 2009). This Court agrees that Donovan is an instructive case and finds that it supports this Court's decision today. In Donovan, the Court held that smoker-plaintiffs could maintain a cause of action in negligence against cigarette manufacturers where the only requested damages was for a "court-supervised program of medical surveillance for early detection of lung cancer." Id. at *1. The court held there was a cognizable claim because the plaintiffs exhibited "[s]ubcellular or other physiological changes . . . which, in themselves, are not symptoms of any illness or disease, but *Page 19 
are warning signs." Id. at *7.[6] Unlike theDonovan plaintiffs, whose lung tissues exhibited changes that warned of potential cancers, Murillo's kidneys, heart, and nerves do not present any physiological changes indicative of future harm. As such, Murillo's request falls outside the strictures ofDonovan. Medical monitoring damages are inappropriate in this case. This Court grants Defendants' motion in full.
 III Conclusion
Plaintiff's motion to limit Dr. Hebben's testimony is granted. She only may testify regarding her credentials and her neuropsychological evaluation of Murillo. Plaintiff's motion to strike the listed inadmissible statements within Dr. Hebben's written report is granted in full. Defendants' motion to exclude Dr. Rosen is denied. He may testify about specific and general causation as intended. Finally, Defendants' motion in limine
regarding the costs of future medical monitoring is granted. Neither Dr. Rosen nor Plaintiff's other witness may present evidence that Murillo requires future medical monitoring. Counsel shall prepare appropriate judgments for entry.
[1] Records indicate that an August 2, 1999 blood test registered Murillo's venous blood lead level at 46 µ g/dl. Thereafter, Murillo was treated at the St. Joseph's Lead Clinic from age two until age five. He was discharged from treatments at age five when his venous blood lead level fell to 7 µ g/dl.
[2] To support her argument that Dr. Hebben is unqualified, Plaintiff's memo includes an appendix of multiple depositions from analogous cases where Dr. Hebben was a witness. (The most recent deposition is from September 2008). Plaintiff, however, has not directly deposed Dr. Hebben in the instant case. Nonetheless, this Court finds no indication that Dr. Hebben has altered her rationale or found additional support for her opinions since the time of the depositions referenced by the Plaintiff. Accordingly, Plaintiff may rely on these legal documents from prior matters to support her motion. This Court invites the Defendants to present any evidence showing Dr. Hebben is otherwise qualified.
[3] This Court notes that Murillo's highest recorded blood lead level was 46 µ g/dl.
[4] Plaintiff's 1st Hebben memo appendix does include a motionin limine filed in the Worcester Housing Court case Aldrea v. Miller, 96-CV-160, that references a Dr. Hebben deposition wherein she stated that Dr. Henrietta Sachs agrees with her lead theories. The plaintiff in the Aldea case, however, pointed out that Dr. Sachs had not practiced medicine in over 20 years and that Dr. Sachs was also excluded from testifying on these outdated theories in the Aldea case.
[5] The University of Virginia Department of Neurology explains that a neuropsychological evaluation consists of:
 a comprehensive assessment of cognitive and behavioral functions using a set of standardized tests and procedures. Various mental functions are systematically tested, including, but not limited to: intelligence, problem solving and conceptualization, planning and organization, attention, memory, and learning, language, academic skills, perceptual and motor abilities, emotions, behavior, and personality.
UVA Dept. of Neurology.
[6] Two particular passages in Donovan are exceptionally on point:
 When competent medical testimony establishes that medical monitoring is necessary to detect the potential onset of a serious illness or disease due to physiological changes indicating a substantial increase in risk of harm from exposure to a known hazardous substance, the element of injury and damage will have been satisfied and the cost of that monitoring is recoverable in tort. No particular level or quantification of increase in risk of harm is necessary, so long as it is substantial and so long as there has been at least a corresponding subcellular change. Donovan, 2009 WL 3321445 at * 7 (emphasis added).
 In this respect, medical expenses are recoverable not only for direct treatment and diagnosis of a present injury or an injury likely to occur, but for diagnostic tests needed to monitor medically a person who has been substantially exposed to a toxic substance that has created physiological changes indicating a substantial increase in risk that the person will contract a serious illness or disease. Id.