Isabella McGOVERN, by and through her Mother and Next Friend Linda McGOVERN, Plaintiff

v.

BRIGHAM & WOMEN'S HOSPITAL and Mary Susan Schilling, M.D., Defendants.

Civil Action No. 07–10643–WGY.

United States District Court, D. Massachusetts.

Nov. 5, 2008.

Kenneth M. Levine, Law Office of Kenneth Levine, Brookline, MA, Sheila Mone, Kenneth M. Levine & Associates, Boston, MA, for Plaintiff.

Ellen E. Cohen, Erin M. Brown, Adler, Cohen, Harvey, Wakeman & Guekguezian LLP, Boston, MA, for Defendants.

*MEMORANDUM*

YOUNG, District Judge.

## I. INTRODUCTION

The plaintiff Isabella McGovern ("McGovern") brought a claim for medical malpractice against Dr. Mary Susan Shilling ("Dr. Shilling") and Brigham & Women's Hospital ("Brigham & Women's") (collectively, "the defendants"), alleging that Dr. Shilling breached the standard of care for obstetricians/gynecologists ("OB/GYNs") during McGovern's birth and caused her to suffer a stroke that resulted in permanent disability. McGovern alleged one count against each defendant for failure adequately to diagnose and treat McGovern's mother Linda McGovern ("the Mother") prior to and during the Mother's labor and delivery, and one count against each defendant for failure to inform the Mother of the alternatives to and risks of a procedure used during McGovern's delivery, vacuum extraction.[1]

---

1. To perform a vacuum extraction, also known as a vacuum-assisted delivery, a physi-

McGovern intended to prove causation through the testimony of Dr. Marc Engelbert, an OB/GYN. The defendants moved for summary judgment on the ground that Dr. Engelbert's testimony failed to meet the standard for admissibility of scientific evidence established in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and codified in Rule 702 of the Federal Rules of Evidence. Therefore, they argued, McGovern could not meet her burden of proof on causation at trial. For the reasons that follow, the Court excluded Dr. Engelbert's testimony and granted summary judgment in the defendants' favor.

## A. Procedural Posture

On April 4, 2007, based on diversity jurisdiction, the Mother filed the instant complaint as next friend of McGovern, who is a minor. Compl. [Doc. No. 1]. The defendants answered, separately, on May 08, 2007. [Doc. No. 6, 7]. The following day, the defendants filed a motion to transfer the case to the Massachusetts Superior Court for the limited purpose of convening a Medical Malpractice Tribunal pursuant to Massachusetts General Laws chapter 231, section 60B. [Doc. No. 8]. The tribunal found, on September 12, 2007, that McGovern's evidence, if properly substantiated, was sufficient to raise a legitimate question of liability appropriate for judicial inquiry. [Doc. No. 12, 13]. The case was reopened before this Court on September 14, 2007.

On October 25, 2007, this Court endorsed the parties' joint proposed case management schedule, which provided that discovery would be completed by July 1, 2008, and dispositive motions would be filed by August 1, 2008. [Doc. No. 20].

On June 13, 2008, in accordance with Rule 26(2) of the Federal Rules of Civil Procedure, McGovern designated two expert witnesses—Dr. Engelbert and Dr. Daniel Adler [2]—whom, she stated, "may be called to testify at trial in this matter regarding the standard of care, causation, damages and Isabella'[s] medical condition and prognosis at all times pertinent to this action." Plaintiffs' Designation of Expert Witnesses. [Doc. No. 21, Ex. A]. She forwarded their reports to the defendants.

The defendants filed a motion to dismiss on August 1, 2008, and submitted a corrected version on August 18, 2008. Motion of Defendants ... To Dismiss Based on *Daubert* ("Defs. Correct. Mtn. to Dismiss"). [Doc. No. 21]. On September 8, 2008, McGovern responded with a memorandum in opposition. Plaintiffs Response to Defendant's Motion to Dismiss ("Pln. Opp'n Mem.") [Doc. No. 23]. At a hearing on September 25, 2008, the Court informed the parties that it would treat the defendants' motion to dismiss as a motion in limine to bar Dr. Engelbert's testimony, and rescheduled argument for October 2, 2008.[3]

---

cian places a soft cup on the head of a baby that is partially delivered, and attaches the cup to a machine that provides suction. *See* American College of Obstetricians and Gynecologists Technical Bulletin, *Operative Vaginal Delivery* 650, 653 (August 1994). Pln. Opp'n Mem. [Doc. No. 23, Ex. D].

**2.** The defendants did not challenge the admissibility of the testimony of Dr. Daniel Adler, a pediatric neurologist. He proposed to testify about the damages suffered by McGovern,

including, inter alia: her diagnoses and treatment from birth to present, the permanency of her injuries, the need for future medical care and service, and the effect of McGovern's injuries on her quality of life and ability to seek and retain gainful employment. Dr. Adler's Report at 5. [Doc. No. 21, Ex. 2].

**3.** A motion in limine is the appropriate procedural vehicle for the relief the defendants sought. *See, e.g., United States v. Frabizio*, 445 F.Supp.2d 152, 154 (D.Mass.2006) (Gert-

After a hearing on that day, the Court granted the defendants' motion to exclude Dr. Engelbert. When counsel for McGovern represented that McGovern had no other expert on causation, the Court granted summary judgment for the defendants. [Doc. No. 25].

## B. Facts

Because McGovern's complaint contains few factual allegations, instead asserting legal conclusions and a "formulaic recitation" of the elements of her causes of action,[4] *see Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the following facts pertaining to the circumstances of McGovern's birth are culled from the Rule 26(2)(B) expert reports, which the defendants submitted to the Court with their motion to dismiss.

The Mother, when forty-one weeks pregnant, was admitted to Brigham & Women's for labor induction on August 8, 2001. Engelbert Report at 1 ("Engelbert Rpt.") [Doc. No. 21, Ex. 1]. Pitocin was administered and the Mother's labor progressed throughout the day with a normal fetal heart rate. *Id.* When she was fully dilated at 10:20 P.M., the Mother was instructed to begin pushing. *Id.* At 1:15 A.M. the next day, the Mother had been pushing for over two and a half hours with minimal progress, fetal heart rate was still normal, and there was palpable fetal activity. *Id.* at 2. Dr. Shilling, according to her medical chart notes, observed that the Mother was completely exhausted and discussed with her the risks and benefits of vacuum-assisted delivery and cesarean section delivery. *Id.* She performed a vacu-um-assisted delivery and McGovern was delivered at 2:10 A.M. *Id.*

During her first nine hours of life, McGovern experienced short episodes of no breathing and was admitted to the neonatal intensive care unit. *Id.* A CT scan that day demonstrated a middle cerebral artery infarction (a stroke), a diagnosis that was confirmed by MRI on August 20, 2001. Dr. Adler's Report at 2.

McGovern has received early intervention services and physical therapy since she was discharged from Brigham & Women's on August 28, 2001. *Id.* at 2–3. In August 2007, when she was six years old, McGovern underwent a neuropsychological examination with the following results: marked attentional variability, six month delay in math and phonics awareness, and marked weakness in right-handed fine motor coordination. *Id.* at 4–5.

## II. ANALYSIS

### A. The *Daubert* Standard

McGovern, as proponent of the expert testimony, had "the initial burden of production and the ultimate burden of persuading the court that the proffered expert evidence satisfies Rule 702, as interpreted by *Daubert* and *Kumho Tire [Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) ]." D.L. Faigman et al., *Science in the Law: Standards, Statistics and Research Issues* 17 (2002). She was required to establish these matters by a preponderance of the evidence. *See Daubert,* 509 U.S. at 593, 113 S.Ct. 2786.

 "Rule 702 of the Federal Rules

---

ner, J.); *United States v. Monteiro,* 407 F.Supp.2d 351, 354 (D.Mass.2006) (Saris, J.).

**4.** McGovern's complaint appears to fail the requirements of Rule 8(a)(2) of the Federal Rules of Civil Procedure and might well have been dismissed on that ground had the defendants so moved before they answered. *See Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

of Evidence [5] assigns to the trial judge the responsibility for ensuring that an expert's testimony as to scientific, technical, or other specialized knowledge 'both rests on a reliable foundation and is relevant to the task at hand.'" *Hochen v. Bobst Group, Inc.,* 290 F.3d 446, 452 (1st Cir.2002) (quoting *Daubert,* 509 U.S. at 597, 113 S.Ct. 2786). To fulfill this gatekeeping role, a court first must determine whether the expert possesses some specialized knowledge such that his or her testimony will be helpful to the trier of fact and, if so, whether that knowledge arises from reliable principles and methods applied in a reliable manner.[6] *See Daubert,* 509 U.S. at 590–91, 113 S.Ct. 2786. "The ultimate purpose of the *Daubert* inquiry is to determine whether the testimony of the expert would be helpful to the jury in resolving a fact in issue." *Hochen v. Bobst Group, Inc.,* 290 F.3d at 452 (quoting *Cipollone v. Yale Indus. Prods.,* 202 F.3d 376, 380 (1st Cir.2000)). A district court has considerable discretion in making this determination. *See United States v. Garcia–Morales,* 382 F.3d 12, 18 (1st Cir.2004).

■ The first step of the *Daubert* inquiry pertains to relevance: to be admissible, an expert's testimony must have a "valid ... connection to the pertinent inquiry." *Cipollone,* 202 F.3d at 380 (quoting *Daubert,* 509 U.S. at 592, 113 S.Ct. 2786). The Supreme Court has described this consideration as one of "fit," *Daubert,* 509 U.S. at 591, 113 S.Ct. 2786 (quoting *United States v. Downing,* 753 F.2d 1224, 1242 (3d Cir. 1985)), explaining that expert testimony not relating to an issue in the case "is not relevant and, ergo, non-helpful." *Id.* (quoting 3 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 702[02], pp. 702–18 (1988)).

■ Once a court has determined that proffered expert testimony is relevant to the task at hand, it must examine whether the testimony rests on a reliable foundation. *See Daubert,* 509 U.S. at 597, 113 S.Ct. 2786. To satisfy this requirement, expert testimony must be the product of reliable principles and methods, *see* Fed. Rule Evid. 702(2), and the expert must have applied the principles and methods reliably to the facts of the case, *see* Fed. Rule Evid. 702(3).

■ Expert testimony is the product of reliable principles and methods if "the theory employed by the expert to explain the meaning of her observations is shown to be valid" and was "derived through the so-called scientific method." 29 Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure: Evidence* § 6266, at Supp. 64 (1997 & 2008 Supp.) (hereinafter Wright & Gold). Among the factors that a court may consider are: (1) the technique's "general acceptance"; (2) whether the opinion can be or has been tested; (3) the technique's known or potential error rate; and (4) whether the theory or technique on which the opinion is based has been subjected to peer review and publication. *See Daubert,* 509 U.S. at 593–594, 113 S.Ct. 2786. Other factors may be relevant, *see Kumho Tire,* 526 U.S.

---

**5.** Rule 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

**6.** As with all expert testimony, the court must next determine whether a scientific expert is qualified, and if so, for what purposes. The defendants did not challenge Dr. Engelbert's qualifications.

at 153, 119 S.Ct. 1167, including whether experts are "proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying," *Daubert v. Merrell Dow Pharms., Inc.,* 43 F.3d 1311, 1317 (9th Cir.1995) (*Daubert II* ), and whether an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire,* 526 U.S. at 152, 119 S.Ct. 1167.

 If the general methodology underlying an expert's proposed testimony is sufficiently reliable, the court must turn to the proffered expert testimony and "query 'whether those principles and methods have been properly applied to the facts of the case.' " *United States v. Monteiro,* 407 F.Supp.2d 351, 358 (D.Mass.2006) (Saris, J.) (quoting Fed.R.Evid. 702 advisory committee's note). As the Supreme Court explained in *General Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997), "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *See also Kumho Tire,* 526 U.S. at 157, 119 S.Ct. 1167 (affirming exclusion of tire failure expert where proponent failed to show that other experts used same methodology, failed to refer to any articles or papers validating expert's approach, and failed to argue that expert himself would have relied on similar opinion). A court evaluating medical expert opinion testimony may consider whether there is contrary, credible expert opinion, *see United States v. Rushing,* 388 F.3d 1153, 1157 (8th Cir. 2004) (concluding that it was not abuse of discretion for district court to consider government's opposing expert as factor in

decision to exclude defendant's expert), and whether the proffered opinion is one that physicians themselves would accept as useful and reliable, *see United States v. Sandoval–Mendoza,* 472 F.3d 645, 655 (9th Cir.2006).

In sum, a district judge performing the "gatekeeper" function required by Rule 702 of the Federal Rules of Evidence asks three preliminary questions:

First, is this junk science? The *Daubert* analysis ought resolve this question.

Second, is this a junk scientist? As a routine matter, this Court asks whether the opinion the proffered expert seeks to give in the case at bar is one that society— outside the litigation process—seeks from this individual as it goes about its daily living. If the science itself is reliable and society seeks comparable opinions from this individual, the Court asks,

Third, is this a junk opinion? In other words, as Justice Breyer expressed it in *Kumho Tire,* is the proffered opinion "adequate to the task at hand." *Kumho Tire,* 526 U.S. at 157, 119 S.Ct. 1167. *See also Joiner,* 522 U.S. at 146, 118 S.Ct. 512.

In this case, obstetrics and gynecology are recognized fields of expert medical endeavor and Dr. Engelbert is a practicing OB/GYN. It is the third question that gives the Court pause.

**B. Dr. Engelbert's Proposed Testimony**

 Dr. Engelbert proposed to testify that the care provided by Dr. Shilling "fell well below the standard of care applicable to an [OB/GYN] delivering an infant in 2001 when she chose to perform a vacuum assisted delivery and not a cesarean section," *see* Engelbert Rpt. at 2–3, and that, "as a result of the inappropriate use of the vacuum, unnecessary trauma resulted to [McGovern] and caused [her] injury." *Id.*

at 4. His opinion was based upon his review of the medical records of the Mother and McGovern, and his "knowledge, education and experience as an [OB/GYN]." *Id.* at 5.

Simply stated, Dr. Engelbert's theory was that: 1) Dr. Shilling breached her duty to McGovern by performing a vacuum-assisted delivery despite contraindications including McGovern's large size and the Mother's "inadequate progress during the active phase of labor" and "prolonged 2nd stage" of labor, *id.* at 3; 2) it is "well-established" that vacuum-assisted delivery can cause stroke, *id.*; 3) McGovern was doing well prior to delivery, *id.* at 5; and 4) "the vacuum assisted delivery caused the [stroke] suffered by [McGovern]," *id.*

Dr. Engelbert's ultimate conclusion, that the vacuum-assisted delivery was the specific cause McGovern's stroke, was based in part upon his opinion that vacuum-assisted delivery is a general cause of stroke in newborns. In his words, "it is well-established in the medical community that a vacuum-assisted delivery device should always be used with caution because of the risk of subgaleal hematoma, intracranial hemorrhage and stroke." Engelbert Rpt. at 3.

The defendants contended that Dr. Engelbert's opinion was not supported by "even one peer reviewed publication available in August 2001," [7] Defns. Correct. Mtn. to Dismiss at 5, and that "[n]o evidence exists that [Engelbert's] opinion(s) have gained acceptance within the scientific community," *id.* at 6. They argued that his opinion was "mere speculation, not supported by reliable scientific knowledge." *Id.* The Court agrees.

While Dr. Engelbert was not required to point to epidemiological data or peer-reviewed publications supporting his opinion, *see Benedi v. McNeil–P.P.C., Inc.,* 66 F.3d 1378, 1384 (4th Cir.1995) ("[u]nder the *Daubert* standard, epidemiological studies are not necessarily required to prove causation, as long as the methodology employed by the expert in reaching his or her conclusion is sound"), he had to do more than merely assert that the causal link between stroke and vacuum delivery is "well-established." *See Grimes v. Hoffmann–LaRoche, Inc.,* 907 F.Supp. 33, 38 (D.N.H.1995) ("an expert cannot establish that a fact is generally accepted merely by saying so."). Recognizing this deficiency, McGovern insisted that "the use of vacuum extractors has been directly linked with cranial trauma," which "is a causative agent in cerebral venous thrombosis [blood clotting]" and "is also correlated with tentorial hemorrhage and mental retardation." Pln. Opp'n Mem. at 5. In support of her position, McGovern submitted a journal article describing case reports of three babies who suffered brain hemorrhage following vacuum-assisted birth, one of whom suffered a stroke, *see* W.C. Hanigan et al., *Tentorial Hemorrhage Associated with Vacuum Extraction,* 85 PEDIATRICS 534 (April 1990), and submitted several bulletins distributed by private and governmental organizations urging the need for caution when performing vacuum-assisted deliveries. Viewed generously to McGovern, these materials suggested that vacuum extraction may present a risk of hemorrhage in the brain, which may result in stroke, and

---

7. The defendants submitted, with their motion to dismiss, affidavits prepared and signed in July 2008 by Dr. Shilling, and two other experts, Drs. Sze Gordon, a radiologist, and Alan Silken, a pediatrician and child neurolo-gist, averring that each was not aware of any peer-reviewed medical publication available in August 2001 that established a causal link between vacuum-assisted delivery and stroke.

provided support for Dr. Engelbert's proposed testimony about general causation.

■ With respect, however, as to Dr. Engelbert's proposed testimony about specific causation—that the vacuum-assisted delivery here was the proximate cause of McGovern's stroke—"there [was] simply too great an analytical gap between the data and the opinion proffered." *See Joiner*, 522 U.S. at 146, 118 S.Ct. 512. While an expert may, as Dr. Engelbert intended, testify solely on the basis of experience, *see Brown v. Wal–Mart Stores, Inc.*, 402 F.Supp.2d 303, 308–09 (D.Me.2005), he "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Id.* (quoting Fed.R.Evid. 702 advisory committee's note). In this case, Dr. Engelbert's opinion was connected to the existing data about the risk of stroke after vacuum extraction only by his own *ipse dixit. Joiner*, 522 U.S. at 146, 118 S.Ct. 512. Moreover, his conclusion was developed expressly for purposes of testifying, *see Daubert II*, 43 F.3d at 1317, and he failed to eliminate other possible causes for McGovern's stroke, *see Baker v. Dalkon Shield Claimants Trust*, 156 F.3d 248, 253 (1st Cir.1998) (observing that properly conducted differential diagnosis [8] is admissible).

## C. Summary Judgment

The defendants were entitled to judgment as matter of law because, without expert testimony, McGovern could not establish causation. *See Sutera v. Perrier Group of Am.*, 986 F.Supp. 655, 667–68 (D.Mass.1997) (Saris, J.) (granting summary judgment for defendant because plaintiffs offered no reliable evidence tending to show causal link between defendant's product and plaintiffs' illness); *Grimes*, 907 F.Supp. at 39 (excluding unreliable testimony of ophthalmologist on causation and granting summary judgment for defendant).

■ Summary judgment is properly entered against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). *See Kelly v. Marcantonio*, 187 F.3d 192, 198, 203 (1st Cir.1999) (concluding that summary judgment on statute of limitations basis was proper where plaintiffs failed to establish applicability of tolling provisions). The defendants, as the party moving for summary judgment, satisfied their initial burden to show the absence of a genuine issue concerning any material fact by pointing to an absence of expert evidence to support McGovern's case. *See Celotex*, 477 U.S. at 325, 106 S.Ct. 2548. An essential element of McGovern's case was that the defendants' negligent conduct was the proximate cause of her injury, an element on which she would have had the burden of proof at trial. *See Semerjian v. Stetson*, 284 Mass. 510, 512, 187 N.E. 829 (1933). Because she would have been required to present expert testimony to meet this burden, *see Haggerty v. McCarthy*, 344 Mass. 136, 139–40, 181 N.E.2d 562 (1962),[9] and

---

8. Differential diagnosis is a "standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 262 (4th Cir.1999).

9. "It is only in exceptional cases that a jury instructed by common knowledge and experience may without the aid of expert medical opinion determine whether the conduct of a physician toward a patient is violative of the special duty which the law imposes as a consequence of this particular relationship."

because her counsel represented that she had no expert on causation other than the excluded Dr. Engelbert, the defendants were entitled to summary judgment. *See Flanders & Medeiros, Inc. v. Bogosian,* 65 F.3d 198, 206 (1st Cir.1995) (affirming order granting summary judgment for defendants on legal malpractice claim where plaintiff failed to produce expert witness, as required for that claim by state law).

### D. Effect of the Medical Malpractice Tribunal's Finding

■ In September 2007, a tribunal acting under Massachusetts General Laws chapter 231, section 60B,[10] found that McGovern's case should proceed to trial. Although the tribunal's findings highlight an unresolved question of Massachusetts law, diversity jurisdiction commands that Rule 702 of the Federal Rules of Evidence determine the admissibility of Dr. Engelbert's testimony in this Court. As explained above, the testimony is inadmissible and the defendants are entitled to summary judgment. The tribunal's findings do not alter this result.

■ The question before the Commonwealth's tribunal was whether the evidence set out in McGovern's offer of proof, if substantiated at trial, would be sufficient to withstand a motion for a directed verdict. *Little v. Rosenthal,* 376 Mass. 573, 578, 382 N.E.2d 1037 (1978). Under the *Little* directed-verdict standard, McGovern's offer of proof had to show: (1) that a doctor-patient relationship existed, (2) that the doctor's performance did not conform to good medical practice, and (3) that damage resulted therefrom. *See Santos v. Kim,* 429 Mass. 130, 132–134, 706 N.E.2d 658 (1999); *Kapp v. Ballantine,* 380 Mass. 186, 193, 402 N.E.2d 463 (1980).

■ In order to be accepted by a medical malpractice tribunal, a plaintiff's offer of proof "must comprise more than mere conclusory allegations or statements of counsel." *Booth v. Silva,* 36 Mass.App.Ct. 16, 19, 626 N.E.2d 903 (1994) (concluding that expert's statement was supported by reference to particularized evidence). *See also Kulas v. Weeber,* 20 Mass.App.Ct. 983, 984, 482 N.E.2d 885 (1985) (affirming tribunal's determination that offer of proof was insufficient because affidavit of plaintiff's expert "consisted of mere conclusory allegations"). The evidence must be such "as a reasonable person might accept as adequate to support a conclusion." Massachusetts General Laws chapter 231, § 60B. Admissible evidence may include, but is not limited to, "hospital and medical records, nurses' notes, x-rays and other records kept in the usual course of the practice of the health care provider without the necessity for other identification or authentication, statements of fact or opinion on a subject contained in a published treatise, periodical, book or pamphlet or state-

---

*Haggerty v. McCarthy,* 344 Mass. 136, 139, 181 N.E.2d 562 (1962) (quoting *Bouffard v. Canby,* 292 Mass. 305, 309, 198 N.E. 253 (1935)). *Cf. Lipman v. Lustig,* 346 Mass. 182, 184, 190 N.E.2d 675 (1963) (concluding that expert testimony was not required where tool that defendant dentist dropped in patient's throat had to be surgically removed).

10. Massachusetts General Laws chapter 231, section 60B provides, in relevant part: "Every action for malpractice, error or mistake against a provider of health care shall be heard by a tribunal consisting of a single justice of the superior court, a physician licensed to practice medicine in the commonwealth under the provisions of section two of chapter one hundred and twelve and an attorney authorized to practice law in the commonwealth, at which hearing the plaintiff shall present an offer of proof and said tribunal shall determine if the evidence presented if properly substantiated is sufficient to raise a legitimate question of liability appropriate for judicial inquiry or whether the plaintiff's case is merely an unfortunate medical result."

ments by experts without the necessity of such experts appearing at said hearing." *Id.*

■ With respect to the *qualifications* of an expert, a "tribunal should give consideration to the proffered opinion of an expert if the offer of proof is sufficient to show that a trial judge in his discretion might properly rule that the qualifications of the witness are sufficient." *Kapp v. Ballantine,* 380 Mass. 186, 192, 402 N.E.2d 463 (1980). In other words, expert evidence that might be admissible at trial must be accepted by a medical malpractice tribunal, *id.,* without any examination of the weight and credibility of the expert evidence. *See Gugino v. Harvard Community Health Plan,* 380 Mass. 464, 468, 403 N.E.2d 1166 (1980). With respect to the *reliability* of expert testimony, however, it is not clear whether the *Kapp* standard governs a tribunal's consideration. Moreover, Massachusetts courts have not addressed the question of whether expert testimony that fails the *Kapp* standard, i.e., testimony that would not be admissible in court, nevertheless may be considered by a medical malpractice tribunal. This Court has unearthed only one case acknowledging that question, *Jasper v. Tomaiolo,* 20 Mass.App.Ct. 201, 204 & n. 5, 479 N.E.2d 705 (1985), and there, the Massachusetts Appeals Court did not provide an answer. The court observed that section 60B's "substantial evidence" language is similar to the state administrative procedure statute, indicating that the answer to the above question might be "yes." *Id.* But the court also pointed out that previously had affirmed a tribunal's dismissal of an action where no judge could have ruled that a treatise relied on by the plaintiff would be admissible at trial, a ruling that suggests the answer is "no." *See Girard v. Crawford,* 13 Mass.App.Ct. 916, 916–17, 430 N.E.2d 851 (1982).

Here the tribunal considered Dr. Engelbert's report, found for McGovern, and the case proceeded to this Court. The troubling question is whether, had this case been brought in the Massachusetts Superior Court, a justice might have allowed Dr. Engelbert to testify, without conducting a reliability inquiry under *Commonwealth v. Lanigan,* 419 Mass. 15, 641 N.E.2d 1342 (1994), merely because the tribunal necessarily had concluded that Dr. Engelbert's opinion was "more than [a] mere conclusory allegation[ ]." *Booth,* 36 Mass.App.Ct. at 20, 626 N.E.2d 903. Whatever the answer in the Superior Court, there is no doubt that the Federal Rules of Evidence resolve the question in diversity proceedings in this Court. *Cameron v. Otto Bock Orthopedic Indus.,* 43 F.3d 14, 18 (1st Cir.1994). Here, as discussed above, Dr. Engelbert's opinion failed the requirements of Rule 702.

## III. CONCLUSION

For the foregoing reasons, on October 2, 2008, the Court granted judgment in favor of the defendants.

SO ORDERED.