# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

MONICA BROUGHTON, individually,  )
and as Parent and Natural Guardian of  )
AMARI M. BROUGHTON-FLEMING,  )
a Minor  )
                                  )
          Plaintiffs,  )         C.A. No. N14C-01-185 VLM
                                  )
     v.  )
                                    )
PETER J. WONG, M.D., and  )
DEDICATED TO WOMEN, OB-GYN,  )
P.A.,  )
                                  )
          Defendants.  )

## MEMORANDUM OPINION

Submitted: November 30, 2017
Decided: February 15, 2017

*Upon Consideration of Defendants' Renewed Motion for Judgment as a Matter of Law or, in the alternative, Motion for a New Trial, or in the alternative, Remittitur,* **DENIED.**

Ben T. Castle, Esquire, and Bruce L. Hudson, Esquire, of Hudson & Castle, LLC, of Wilmington, Delaware. *Attorneys for Plaintiffs.*

Richard Galperin, Esquire, and Joshua H. Meyeroff, Esquire, of Morris James LLP, of Wilmington, Delaware. *Attorneys for the Defendants.*

**MEDINILLA, J.**

## INTRODUCTION

On September 26, 2017, after a seven-day medical negligence trial, a jury returned a $3 million verdict in favor of Monica Broughton (Mother), individually and as parent and natural guardian of nine-year-old Amari Broughton-Fleming (Amari) ("Plaintiffs"). Defendants, Dr. Peter Wong and Dedicated to Women OB-GYN, P.A. ("Defendants"), seek judgment as a matter of law, a new trial, or remittitur. After consideration of the parties' briefings and oral arguments, for the reasons stated below, Defendants' Renewed Motion for Judgment as a Matter of Law, or in the alternative, Motion for a New Trial, or Remittitur is **DENIED**.

## FACTUAL AND PROCEDURAL HISTORY

Plaintiffs brought this medical negligence claim against Defendants, alleging that Dr. Wong negligently applied excessive lateral traction during childbirth with such force that the stretching of Amari's head during delivery caused a permanent right brachial plexus injury. In response, Defendants maintained that, in the presence of a shoulder dystocia, Dr. Wong used what he considered to be a "unique" method of delivery and noted in his records that he had "not applied any traction" to Amari.[1] To explain the cause of injury, Defendants relied heavily upon the American Congress of Obstetricians and Gynecologists ("ACOG") Monograph as scientific evidence that Amari's injury was the result of maternal endogenous forces

---

[1] Defs.' Mot. at ¶ 2.

2

during labor, not attributable to the physician's actions. In other words, Mother's pushing during the delivery caused the permanent injury.

During the seven days of trial, the undisputed facts included that during delivery, the force that occurred during labor was sufficient to cause both transient and permanent nerve damage to Amari's right arm. As a result, both as an infant and a young child, he underwent two major surgeries to repair the damaged nerves, but his injury has left him permanently impaired. When Amari took the stand, the jury noted that his arm was visibly shorter than the other. Even at such a young age, he was able to articulate how the injury has affected him throughout his life. He explained why he has never been able to ride a bicycle, and described how his injury prevents him from being able to play his favorite sports such as football, soccer, or baseball. Through medical testimony, the jury also heard that these physical deficits will carry into his adult life.

Both sides presented inconsistent accounts from eyewitnesses who were present in the delivery room. Amari's father and maternal grandmother both testified that they observed Dr. Wong pull on Amari's head when he was emerging during delivery. In contradiction, Defendants' medical witnesses, also present during the delivery, testified that they did not make similar observations, and Dr. Wong, of course, denied that he ever pulled on Amari's head. Against this factually

3

inconsistent backdrop, the parties' medical experts offered conflicting opinions on the critical issues of standard of care and causation.

Prior to trial, Defendants filed motions *in limine* seeking to exclude the testimony of Plaintiffs' experts, Drs. Marc Engelbert and Scott Kozin, offered to opine on standard of care and causation.[2] Defendants objected that both failed to meet the requirements of D.R.E. 702 and under *Daubert*,[3] arguing, in part, that they were relying upon impermissible *res ipsa loquitur* or *ipse dixit*-type reasoning—that the presence of the injury alone meant that Dr. Wong breached the standard of care and caused the injury.[4] The Court accepted Plaintiffs' responses to the motions and agreed that both experts satisfied the requirements under D.R.E. 702 and *Daubert* sufficient to testify at trial.

After both the close of Plaintiffs' case and again when all the evidence was in, Defendants made their application for judgment as a matter of law under Superior Court Civil Rule 50(a). Defendants reiterated their objections concerning Dr. Engelbert's "*res ipsa*" reasoning underlying his opinion and raised an additional argument that excessive traction could be appropriate as a lifesaving alternative in a

---

[2] Defendants do not ask this Court to revisit arguments regarding Dr. Kozin, and renew this motion only with respect to the opinion of Dr. Engelbert.

[3] *Daubert v. Merrell Dow Pharm, Inc.*, 509 U.S. 579 (1993).

[4] In addition to the arguments raised regarding the experts' methodologies, Defendants' motions *in limine* also asserted that each expert's opinion lacked an adequate factual basis.

4

medical emergency sufficient to warrant judgment in their favor. This Court determined that there was a sufficient basis from which a reasonable jury could find in favor of Plaintiffs and denied Defendants' motions.

On October 9, 2017, Defendants renew their Motion for Judgment as a Matter of Law under Superior Court Civil Rule 50(b), or alternatively seek a new trial under Rule 59, or remittitur. Plaintiffs responded in opposition on October 20, 2017. Oral arguments were heard on November 21, 2017, wherein Defendants presented additional authority to support their position. This Court granted leave so that the parties could address the applicability of the newly presented case law. Plaintiffs submitted their positions on November 22, 2017 and Defendants filed a response on November 30, 2017. Having considered all submissions, the matter is now ripe for review.

## RENEWED JUDGMENT AS A MATTER OF LAW

### *Standard of Review*

Superior Court Civil Rule 50(a) that reads as follows:

> If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the Court may determine the issue against the party and may grant a motion for judgment as a matter of law . . . . [5]

---

[5] DEL. SUPER. CT. CIV. R. 50(a).

5

As occurred in this case, if such a motion is denied or is not granted, the motion may be renewed following trial pursuant to Superior Court Civil Rule 50(b).[6] Viewing all the evidence in the light most favorable to the non-moving party, the Court must determine whether the evidence and all reasonable inferences that can be drawn therefrom could justify a jury verdict in favor of the plaintiff(s).[7] "Thus, 'the factual findings of a jury will not be disturbed if there is *any* competent evidence upon which the verdict could reasonably be based.'"[8]

### *Discussion*

The Court agrees with Defendants that the jury cannot presume negligence from the mere presence of an injury.[9] The jury was instructed accordingly. In their renewed motion, Defendants maintain that Plaintiffs offered no legally sufficient evidentiary basis for a reasonable jury to find in their favor because Dr. Engelbert's standard of care opinion advanced an impermissible *res ipsa loquitur* theory. In support, Defendants extract select lines from Dr. Engelbert's expert testimony to reiterate that his opinion is fatally flawed because he testified during trial that had

---

[6] DEL. SUPER. CT. CIV. R. 50(b).

[7] *Atwell v. RHIS, Inc.*, 2007 WL 914648, at *1 (Del. Super. Feb. 26, 2007) (citing *Mumford v. Paris*, 2004 WL 231611, at *2 (Del. Super. Jan. 31, 2003)).

[8] *Mumford*, 2003 WL 231611, at *2 (quoting *Delaware Elec. Co-op, Inc. v. Pitts*, 633 A.2d 369, 1993 WL 445474, at *1 (Del. Oct. 22, 1993) (TABLE) (emphasis added)).

[9] *Ciociola v. Del. Coca-Cola Bottling Co.*, 172 A.2d 252, 257 (Del. 1961).

there been no *permanent* injury, then Dr. Wong would have met the standard of care. For the following reasons, this Court finds that Defendants fail to establish why they are entitled to relief as a matter of law under Rule 50(b).

First, this Court notes that although Dr. Engelbert was offered as an expert on the issue of whether Dr. Wong breached the standard of care, the Defendants elicited testimony on cross-examination concerning issues of causation in order to further develop their *res ipsa loquitur* argument.[10] Since the legal doctrine of *res ipsa loquitur* relates to *causation*—versus standard of care—it stands to reason that Defendants had to engage in a thorough cross-examination on the issue of causation if they were to successfully argue that Dr. Engelbert employed a *"res ipsa"* approach in reaching his opinion. Therefore, the Court notes that references from Dr. Engelbert's testimony necessarily went beyond a "standard of care" opinion and touched upon issues of causation when he was challenged to defend his opinion.

A dispute for the jury to decide was whether the permanent damage suffered by Amari was caused by the excessive force applied by Dr. Wong or Mother. To refute Dr. Engelbert's opinion that Dr. Wong was negligent, Defendants questioned him extensively regarding conclusions from the ACOG Monograph, which they

---

[10] *Res ipsa loquitur* is a legal doctrine concerning causation; it is a "doctrine providing that, in some circumstances, the mere fact of an accident's occurrence raises an inference of negligence that establishes a prima facie case." BLACK'S LAW DICTIONARY (10th ed. 2014).

7

maintained established scientific evidence that Amari's injury was the result of maternal endogenous forces during labor. Plaintiffs' experts, including Dr. Engelbert, criticized many of the conclusions reached in the ACOG Monograph, in large part because the study did not fully differentiate between a permanent versus transient injury.

These medical—versus legal—references to the critical distinctions between a permanent and transient brachial plexus injury were highlighted throughout the trial and vital to Dr. Engelbert's ability to both defend his opinion as more than merely a *"res ipsa"* conclusion, and to refute Defendants' theory that it was Mother's force that caused the injury as challenged on cross-examination. Equally as important to Dr. Engelbert's opinion was that the determination of whether the injury was permanent or transient was not readily apparent at the time of delivery. Therefore, while some nerves that suffered a transient injury were able to be repaired, the diagnosis and cause of the permanent brachial plexus injury could not be made until it was known that some nerves were permanently damaged. To the extent that the ACOG Monograph identified instances of injury caused by maternal forces, Plaintiffs established that these injuries were transient, not permanent in nature. Therefore, Plaintiffs argued that the conclusions from the ACOG Monograph could not be applied to Plaintiff Amari's case.

Dr. Engelbert testified that there were no undisputed cases of permanent brachial plexus injury that resulted from endogenous (or maternal) forces. His testimony centered on the difference between a permanent or temporary nerve injury and the known, undisputed causes of permanent brachial plexus injuries. In fact, Dr. Engelbert ruled out other causes, including Mother's force. His opinion on standard of care is perhaps best summed up in the following portion:

> Understanding that to get that extent of an injury in the face of a shoulder dystocia, in his situation there is no other possible cause other than excessive traction. There are rare causes of permanent brachial plexus injury that don't apply to Amari. You rarely see this: Cancer in the brachial plexus, or an infection in the brachial plexus. These are rare causes which didn't apply to Amari. Sometimes the mother -- the mother, Monica, could have had something wrong with her uterus, where Amari's shoulder could have been stuck in a bad position because of the uterus. In those situations, the babies that get affected that way, they have muscle atrophy, which Amari didn't have. So when you look at the other causes of permanent injury, none of them applied to Amari.[11]

Dr. Engelbert rejected the opinion of Defendants' experts that a permanent injury could be caused by Mother and he explained his rationale to the jury. These included excessive downward lateral traction, as was alleged in this case, and ruling out a few rare causes, such as cancer, infection, or the shape of the mother's uterus, not present here.

---

[11] Trial Testimony of Marc Engelbert, M.D., hereinafter referred to as "TE__," 46:13–47:03.

9

Yet Defendants maintain that Dr. Engelbert's testimony was speculative and cite an unrelated District Court of Massachusetts case of *McGovern v. Brigham & Women's Hospital*.[12] This Court finds that *McGovern* is distinguishable. In *McGovern*, the District Court found that Dr. Engelbert's opinions were "mere speculation, not supported by reliable scientific knowledge," unsupported by "even one peer reviewed publication" then available.[13] That is not the record here. Plaintiffs established that Dr. Engelbert's opinion was supported by multiple, reliable medical sources, including Williams *Obstetrics* (24th ed.),[14] Gabbe *Obstetrics: Normal and Problem Pregnancies* (7th ed.),[15] O'Leary *Shoulder Dystocia and Birth Injury* (3d ed.),[16] a peer-reviewed study by Mollberg "Comparison in Obstetric Management on Infants with Transient and Persistent Brachial Plexus Palsy,"[17] and Creasy and Resnik, *Maternal-Fetal Medicine* (7th ed.).[18] Dr. Engelbert went beyond merely asserting that a causal link was "well-

---

[12] *See McGovern v. Brigham & Women's Hosp.*, 584 F. Supp. 2d 418, 425–26 (D. Mass. 2008).

[13] *Id.*

[14] TE 24:23–28:23.

[15] TE 29:01–31:13.

[16] TE 31:14–36:07.

[17] TE 36:08 – 38:23.

[18] TE 39: 03–40:19.

established," as was problematic in *McGovern*.[19] Additionally, distinguishable from *McGovern*, with respect to Dr. Engelbert's overall methodology, here Dr. Engelbert did not "fail[] to eliminate other possible causes" of the injury.[20] Furthermore, Defendants had an opportunity to cross-examine Dr. Engelbert when he ruled out the mother's endogenous forces as another possible cause when they questioned him extensively regarding the ACOG Monograph.

Defendants' further reliance on our court's decision in *Norman v. All About Women*[21] is also unpersuasive. There, the court granted a motion *in limine* to exclude the plaintiff expert's standard of care testimony because "no evidence has been presented that [the expert]'s opinion [was] 'based on information reasonably relied upon by experts' in his field."[22] Unlike the expert in *Norman*, for the reasons previously stated, this Court finds that the jury had evidence before them to consider and accept Dr. Engelbert's opinion that the permanent injury could only be the result of excessive lateral traction. In doing so, there was evidence in this case that his opinion was based upon medical records, eyewitnesses' accounts of the delivery,

---

[19] *McGovern*, 584 F. Supp. 2d at 425.

[20] *Id.* at 426.

[21] *Norman v. All About Women P.A.*, 2017 WL 5624303 (Del. Super. Ct. Nov. 16, 2017).

[22] *Id.* at *2.

11

and all other information an expert would ordinarily rely upon in his field, including ruling out other causes—not an uncommon exercise used in the medical field, and previously accepted as admissible in other cases in similar medical negligence actions.[23]

While perhaps Dr. Engelbert could have stated his opinion differently, the line between medical and legal language is often blurred and this Court is often asked use its discretion regarding the admissibility of expert opinion. The Supreme Court has previously recognized in *Mammarella v. Evantash*[24] and *Moses v. Drake*[25] that there is not a set script medical experts must follow when they render opinions.[26] Rather, this Court may "exercise some discretion to determine whether the opinion offered by an expert, when considered in light of all the evidence, meets [the] legal standard."[27]

---

[23] *See Lewis v. McCracken*, 2016 WL 6651417, at *4 (Del. Super. Ct. Nov. 7, 2016) (expert met the requirements of D.R.E. 702 and *Daubert* where the expert reviewed medical records, deposition transcripts and medical literature, and, in rendering a differential diagnosis, determined the only possible cause of permanent brachial plexus injury was excessive traction during childbirth).

[24] 93 A.3d 629 (Del. 2014).

[25] 109 A.3d 562 (Del. 2015).

[26] *Moses*, 109 A.3d at 568; *Mammarella*, 93 A.3d at 636–37.

[27] *Moses*, 109 A.3d at 568.

Accordingly, Dr. Engelbert's opinion, when considered in light of all the evidence, meets the requirements under D.R.E 702 and *Daubert.* Given the issues in this case, it was proper for the jury to understand the distinctions about the severity of the injury through his explanation, and to be given an opportunity to refute the conclusions in the ACOG Monograph. On cross-examination, it was appropriate for him to defend his conclusions, rule out other causes, and explain why the permanency of the injury was germane to his opinion that Dr. Wong's unique method of delivery breached the standard of care. The jury was free to accept or reject Dr. Engelbert's opinion as presented in the same manner as they were free to accept the versions from Dr. Wong or Defendants' experts. For these reasons, this Court finds that Dr. Engelbert's opinion went beyond a *res ipsa loquitur* conclusion and the testimony challenged by Defendants goes to the weight of the evidence, not its admissibility.

Defendants next argue that they are entitled to judgment as a matter of law because Dr. Engelbert testified on cross-examination that excessive traction could, in some cases, be an appropriate alternative medical treatment.[28] Defendants

---

[28] It is unclear if Defendants are arguing there was an alleged deficiency in Dr. Engelbert's testimony or that the Court failed to give an alternative medical treatment jury instruction, particularly as they cite to *Corbitt v. Tatagari*, 804 A.2d 1057 (Del. 2002). The Court will address both arguments, although not expressly raised.

13

maintain that judgment in their favor is mandated because his testimony suggested a medical event could qualify as a "lifesaving situation," such that the testimony unequivocally locks Dr. Engelbert into a position where he could not properly opine that Dr. Wong breached the standard of care. Defendants reliance on *Corbitt v. Tatagari*[29] and *Burgos v. Hickok*[30] is somewhat misplaced.

*Corbitt* deals with the use of an "alternative medical treatment" jury instruction, *not*, as Defendants suggest, that the expert's testimony warrants judgment as a matter of law. The alternative medical treatment jury instruction states: "[w]hen a physician chooses between appropriate alternative medical treatments, harm resulting from a physician's good faith choice of one proper alternative over the other is not medical malpractice."[31] The Court chose not to give this instruction for two reasons.

First, the evidence did not establish there were viable alternative options of treatment available to Dr. Wong in this case. In fact, when confronted with a shoulder dystocia, Dr. Wong testified that he had no choice but to use his unique method of delivery in what he considered to be a life-threatening situation. Second,

---

[29] 804 A.2d 1057 (Del. 2002).

[30] 695 A.2d 1141 (Del. 1997).

[31] *Corbitt*, 804 A.2d at 1063–64.

Dr. Engelbert's limited testimony on this subject did not suggest that excessive lateral traction could ever be considered "an appropriate alternative medical treatment" at the moment it was allegedly used in this case.

*Burgos* stands for the proposition that "the entry of a verdict in favor of the defendant is appropriate only when, under the evidence presented by the plaintiff, reasonable minds could draw but one inference and that inference is that a verdict favorable to the plaintiff is not justified."[32] Here, Dr. Wong said there was no alternative available to him. In contrast, Dr. Engelbert testified that Dr. Wong's unique method of delivery was not appropriate, and he would have waited additional time before employing any traction efforts as a lifesaving maneuver.[33] The jury was free to weigh the differing medical opinions, and the timeframes that they offered. They were also free to consider and draw inferences from the eyewitnesses who testified about what they saw during the delivery and decide what version to accept about how and when the traction, if any, was used. Dr. Engelbert did not accept excessive traction as a lifesaving alternative within the same timeframe that Dr. Wong did. Reasonable minds can draw more than just one inference from the

---

[32] *Burgos*, 695 A.2d at 1144.

[33] TE 52:11–53:04; 53:13–15; 54:01–03.

15

available testimony. As such the entry of a verdict in favor of Defendants is not appropriate in these circumstances.

Viewing all the evidence in the light most favorable to the non-moving party, the Court determines that the evidence and all reasonable inferences that can be drawn justified a jury verdict in favor of Plaintiffs. Defendants have not shown that there is *no* competent evidence upon which the verdict could reasonably be based. As such, Defendant's motion under Rule 50 must be denied.

## MOTION FOR NEW TRIAL

### *Standard of Review*

A motion for a new trial under Delaware Superior Court Civil Rule 59 may be granted where the jury verdict "shocks the Court's conscience and sense of justice."[34] The jury's verdict is entitled to "enormous deference."[35] The Court will not upset the verdict "unless 'the evidence preponderates so heavily against the jury verdict that a reasonable jury could not have reached the result' or the Court is

---

[34] *Young v. Frase*, 702 A.2d 1234, 1237 (Del. 1997) (quoting *Mills v. Telenczak*, 345 A.2d 424, 426 (Del. 1975)). *See also* DEL. SUPER. CT. CIV. R. 59.

[35] *See, e.g., Gallo v. Buccini/Pollin Group*, 2008 WL 836020, at *6 (Del. Super. Mar. 28, 2008) (quoting *Frase*, 702 A.2d at 1236; *Storey v. Castner*, 314 A.2d 187, 193 (Del. 1973)).

16

convinced that the jury disregarded applicable rules of law, or where the jury's verdict is tainted by legal error committed by the Court during the trial."[36]

## *Discussion*

Defendants argue that the use of what they consider "improper statistical evidence"[37] entitles them to a new trial under *Timblin v. Kent General Hospital (Inc.)*.[38] Specifically, Defendants claim that portions of Dr. Engelbert's trial testimony and the repetitive questioning of all medical experts regarding complications associated with a shoulder dystocia qualify as improper statistical evidence under *Timblin*. This Court finds that the merits and the timeliness of this argument do not fall under *Timblin*.

In *Timblin*, a hospital allegedly failed to properly ventilate a heart attack patient after he went in to cardiac arrest, resulting in a neurological deficit. During the direct examination of one of the emergency room physicians, the doctor testified that "published studies cite a short-term hospital mortality without thrombolytic therapy within the range of ten to fifteen percent."[39] Later, a defense expert opined

---

[36] *Mitchell v. Haldar*, 2004 WL 1790121, at *3 (Del. Super. Ct. Mar. 20, 2008) (quoting *Storey v. Camper*, 401 A.2d 458, 465 (Del. 1977)).

[37] Defs.'s Mot. at ¶ 5.

[38] 640 A.2d 1021 (Del. 1994).

[39] *Id.*

that very few patients who suffer cardiopulmonary arrest survive. Defendant attempted to tie these statistics with standard of care, asking the expert whether anything about plaintiff's condition was properly performed. The defense expert responded:

> The fact that he was resuscitated . . . . Statistically we know less than twenty-five percent of patients whose heart [sic] goes into asystole [cessation of electrical activity] can be resuscitated; I think it's one out of twenty. I think it was remarkable that they were able to bring his heart back under those circumstances.[40]

Our Supreme Court held that the admission of this "statistical evidence was erroneous because its probative value was substantially outweighed by its prejudicial effect."[41] Such information was not germane to whether the hospital acted in conformity with the applicable standard of care, which was the only issue before the trial court. In that case, there was no dispute that the damage to the plaintiff's brain was caused by a long period of oxygen deprivation and that the long period was because plaintiff was not intubated.[42] Therefore, the causation issue was solely whether the inability to intubate was caused by the hospital's alleged negligence, "not whether [plaintiff's] brain damage was an inevitable result."[43] The *Timblin*

---

[40] *Id.* at 1022–23 (alterations in original).

[41] *Id.* at 1023.

[42] *Id.* at 1024–25.

[43] *Id.* at 1025.

Court found that the probative value of the statistical evidence was therefore minimal, if not of no value. The statistical evidence that was presented in that case was also deemed to be misleading since "[t]he statistics invited an inference that, because the majority of patients who suffer a cardiac arrest die or suffer brain damage, [plaintiff] was expected to suffer brain damage."[44]

Here, Defendants do not specifically identify what language from Dr. Engelbert is objectionable, only citing generally to two pages of his trial testimony.[45] Page one includes the following testimony: "Everybody, millions of us, we all were delivered, and millions of babies every day go through maternal forces, contractions, pushing. If that could cause permanent brachial plexus injuries, logically there would be lots more babies, lots more people, affected with permanent brachial plexus injuries."[46] This testimony makes no statistical references. Also, there is no particular study identified. If anything, it is an appeal to the common sense of the jury and directly rebutting Defendants' trial theory that mother's endogenous forces caused the injury.

---

[44] *Id.* at 1026.

[45] Defs.' Mot. at ¶ 5.

[46] TE 48:17–23.

The second page cited by the Defendants includes the following question by Plaintiffs' counsel and the response by Dr. Engelbert:

Q:    Permanent neurological injuries rarely occurred in one or two of every 10,000 births. Does that conform with that [sic] understanding is in terms of frequency?

A:    It's an approximation, yes.[47]

Here, without objection, Plaintiffs' counsel is questioning Dr. Engelbert about a particular study, Creasy and Resnik, *Maternal-Fetal Medicine* (7th ed.). While including a statistic—one or two out of every 10,000 births—this testimony only generally speaks to how rare brachial plexus injuries are. Such testimony is distinguished from the statistical evidence in *Timblin* because such testimony does not "invade[] the province of the trier of fact."[48] It was agreed to by all experts that these injuries are rare. The background information was relevant to the Plaintiff's particular injury and did nothing to confuse the jury or obscure issues of fact.

Finally, Defendants object to the recurring questioning of all experts and Defendant Dr. Wong with the following questions: In their professional career (1) How many births had the physician performed?; (2) How many shoulder dystocias

---

[47] TE 39:12–16.

[48] *Timblin*, 640 A.2d at 1025 (citing *Wheat v. State*, 527 A.2d 269, 275 (Del. 1987)).

20

had the physician encountered?; and (3) How many permanent brachial plexus injuries had the physician encountered? Plaintiffs respond that these questions go to the experience of each physician, to the relative rarity of these types of injuries, and generally provide background information. Plaintiffs further argue that the probative value of the information is not substantially outweighed by its potential for prejudice. The Court agrees.

Plaintiffs asked the same laundry list of questions to all medical witnesses about their own individual and professional experiences. The responses do not constitute statistical evidence of the kind deemed fatal in *Timblin*. Here, the jury heard from the medical witnesses about their individual experiences when faced with these medical events during their professional careers. It was abundantly clear from the testimony of *all* experts that a shoulder dystocia is a rare obstetrical complication and that brachial plexus injuries are extremely uncommon. Such testimony was even elicited by Defendants in their discussion of the ACOG Monograph with all of the experts, especially in their questioning of the experts as to whether a shoulder dystocia could constitute an emergency situation. Unlike *Timblin*, the responses from the experts were not based on studies.

Even assuming, *arguendo*, that any of this testimony was statistical evidence under *Timblin*, a new trial is not appropriate where Defendants failed to object. Parties must make contemporaneous objections at trial. Our Court has recently

21

opined concerning the perverse incentives that arise from granting a new trial under such circumstances:

> Despite their failure to object at trial, [the party] now comes[s] before the Court urging that a legal error occurred . . . . Were the Court to grant this Motion, the practical effect of [the party's] conduct is that [the party] could make a strategic decision not to object at trial with the hope of receiving a favorable verdict, but if [the party] received an unfavorable jury verdict, they would be assured of a new trial before a new jury with the possibility of a different outcome. The Court will not retroactively cure any perceived mistake created by trial counsel's failure to object at trial.[49]

Defendants made a strategic decision and the Court is reluctant to provide a retroactive cure that could encourage gamesmanship. Unlike *Timblin*, Defendants did not preserve their objection.[50] The Court was also unable to undertake a Rule 403 analysis. Even if it had been asked to do so, the responses to the questions simply reiterated what the jury knew about the rarity of these injuries.

Finally, this Court briefly addresses Defendants' argument that the verdict is against the "great weight of the evidence."[51] For the reasons stated, the Court does not agree. The seven-day trial allowed both sides to present their respective

---

[49] *Cohen-Thomas v. Lewullis*, 2016 WL 721009, at *4 (Del. Super. Ct. Jan. 29, 2016).

[50] *Timblin*, 640 A.2d at 1022

[51] Defs.' Mot. at ¶ 6 (citing *Storey v. Camper*, 401 A.2d 458, 465 (Del. 1979)).

positions through lay and expert witnesses. The evidence does *not* weigh so heavily against the jury verdict that a reasonable jury could not have reached the result.[52]

## REMITTITUR

### *Standard of Review*

On Defendants' Motion for Remittitur, the Court must evaluate the evidence and decide whether the jury award falls within a range supportable by the evidence.[53] An award will not be set aside unless it is so excessive as to shock the court's conscience and sense of justice or the jury manifestly disregarded the applicable rules of law.[54] The Court should defer to the jury and reduce the jury award to the absolute maximum amount that the record can support.[55] "It is well-settled that jury verdicts be given great weight. If a trial has been conducted properly, a jury is the best way to determine an injured plaintiff's damages."[56]

---

[52] *Camper*, 401 A.2d at 465.

[53] *Reid v. Hindt*, 976 A.2d 125, 131 (Del. 2009).

[54] *Storey v. Castner*, 314 A.2d 187, 193 (Del. 1973); *Riegel v. Aastad*, 272 A.2d 715, 718 (Del. 1970).

[55] *Reid*, 976 A.2d at 131.

[56] *West v. Maxwell*, 2001 WL 789654, at *6 (Del. Super Ct. June 29, 2001) (citing *Medical Ctr. of Del., Inc. v. Lougheed*, 661 A.2d 1055, 1061 (Del. 1995).

## *Discussion*

Defendants argue that the $3 million verdict is excessive and only the result of the impermissible motive of "passion."[57] The Court finds that the $3 million verdict is supported by the evidence.

In reaching its award, the jury heard testimony from experts, Amari's family and Amari himself about the painful medical treatment that Amari underwent, and the physical and mental impact that the injury has had, and will continue to have on his life. This included, but was not limited to, considerations that Amari cannot engage in activities that other children take for granted, such as playing sports or riding a bicycle. The jury heard testimony that the physical deficits and mental consequences will remain with him throughout his adult life.

The jury was instructed that their verdict must be based solely on the evidence in this case and that they could not be influenced by sympathy, prejudice, or public opinion. There is no evidence that the jury "manifestly disregarded the applicable rules of law."[58]

---

[57] Defs.' Mot. at ¶ 6 (citing *Med. Ctr. of Del., Inc. v. Lougheed*, 661 A.2d 1055, 1061 (Del. 1995); *Riegel*, 272 A.2d 715, 717–18 (Del. 1970)).

[58] *See Storey v. Castner*, 314 A.2d 187, 193 (Del. 1973); *Riegel v. Aastad*, 272 A.2d 715, 718 (Del. 1970).

24

Jury verdicts should receive great weight. It has been cautioned that "[i]t is difficult, if not potentially dangerous, to refer to other kinds of cases to argue a particular verdict is too high or too low. There are too many variables . . . ."[59] The Court will therefore not engage in such comparison. This Court's conscience is not shocked by the verdict.

## CONCLUSION

Viewing all the evidence in the light most favorable to the non-moving party, the Court determines that the evidence and all reasonable inferences that can be drawn justified a jury verdict in favor of Plaintiffs. Under Rule 50, Defendants have not shown that there is *no* competent evidence upon which the verdict could reasonably be based. Defendants further fail to establish why a new trial is warranted under Rule 59. Remittitur is inappropriate because the jury verdict is supported by the evidence. Therefore, Defendants' Renewed Motion for Judgment as a Matter of Law, or in the alternative, Motion for a New Trial, or in the alternative, Remittitur is **DENIED**.

**IT IS SO ORDERED.**

Judge Vivian L. Medinilla

---

[59] *Bissel v. Taylor*, 1994 WL 555340, at *7 (Del. Super. Ct. Sept. 14, 1994).

oc: Prothonotary
cc: All Counsel on Record (*via e-filing*)